JUDGE SIMPSON
delivered the opinion op the court:
The legislature of Kentucky, by an act approved February 3d, 1833, authorized the Lexington and Ohio railroad company to borrow one hundred and fifty thousand dollars upon bonds to be issued by the company and indorsed by the state, upon the condition, however, that the company would, as an indemnity to the state, mortgage to it all its property, rights, privileges, &c.,with power to sell the same in default of payment of either principal or interest. The sale was to be made by the auditor of public accounts, who was also authorized to purchase it for the state with the advice and approbation of the governor and attorney general.
The money was borrowed under the act, on the bonds of the company, the payment of which was guarantied by the state, and a mortgage was executed by the company according to the requisitions of the act.
By an act of the legislature, approved February 15th, 1838, the railroad company was authorized to issue bonds to the *182 amount of nine hundred thousand dollars, if that much was necessary for the completion of the road, and to mortgage the same property to secure the payment of the money so borrowed. The act contains the following proviso : “ That nothing in this act shall be construed as an extinguishment or release of the lien now held by the state on said road, but merely as a waiver or postponement of said lien in favor of any mortgage hereafter executed, &c., pursuant hereto.”
Under the provisions of this act, the city of Louisville agreed to guarantee the bonds of the company to the amount of nine hundred thousand dollars, and a mortgage for her indemnity was executed by the company on the 23d day of November, 1838, on the same property which had been previously mortgaged to the state.
The company issued two bonds of ten thousand dollars each, one payable to the president, directors and company of the Northern Bank of Kentucky, and the other to the president, directors and company of the Bank of Kentucky. They were issued in the year 1838, payable in thirty years, with legal interest from the date, which was to be paid semi-annually, and the payment of the principal and interest was guarantied by the city of Louisville. Bonds to the amount of twenty thousand dollars more were issued and guarantied in the same manner, and sold to the board of internal improvements. No other bonds were disposed of by the company, it being unable to negotiate a sale of any more, and consequently, the amount of money contemplated by the act of the legislature, as well as by the mortgage executed to the city of Louisville, was never realized.
By an act approved 17th of February 1840, so much of the act of 1838, as waived or postponed the lien of the state on its mortgage, was repealed.
In February, 1841, an act was passed, authorizing the railroad company to borrow $85,000 and mortgage the road to secure its payment; but if the money was not obtained, the auditor was to proceed to make sale of the road, &c., under the mortgage which was executed to the state in 1833, the *183 state having had to pay for the company the $150,000 therein mentioned.
The company having failed to obtain the loan authorized by the act of 1841, the auditor in January, 1842, sold the entire road, and everything belonging to it, and the state became the purchaser, at a price sufficient to pay the $150,000 and the interest due thereon. In the month of June, in the same year, the auditor made a conveyance thereof to the state, which was recorded in the clerk’s office of this court.
In 1847 an act of the legislature was passed, incorporating the Louisville and Frankfort railroad company; and by the provisions of the act, commissioners were to be appointed to value the right of way, and of labor done on that part of the road situated between Frankfort and Louisville, and when ascertained, the company incorporated by the act was to execute its bond to the state for the amount, which was to be the pi’ice that it was to pay for the entire interest of the state in that part of the road. The valuation was made, and the bond executed as required by the act.
Afterwards, in February, 1848, the Lexington and Frankfort railroad, company was incorporated, in which the state became a stockholder to the amount of $150,000, payable by a surrender to the company, on the part of the state, of all its property, rights and privileges, in that part of the road between Lexington and Frankfort.
In the month of May, 1854, the Northern Bank of Kentucky filed a petition in equity against the Lexington and Frankfort railroad company, the Louisville and Frankfort railroad company, the city of Louisville, the Commonwealth of Kentucky, and the Lexington and Ohio railroad company, asserting alien' on the road, under the mortgage to the city of Louisville, for the payment of the bond for ten thousand dollars aforesaid, and the interest thereon, which to a considerable amount was then in arrear and unpaid.
By subsequent pleadings, the Bank of Kentucky was made a co-plaintiff with the Northern Bank, and the commissioners of the sinking fund were made defendants. By the acts incorporating the Louisville and Frankfort railroad company, and *184 the Lexington and Frankfort railroad company, the bond executed by the former, and the stock issued by the latter, were transferred to the sinking fund, and for that reason the commissioners were made parties to the action.
The circuit court rendered a judgment for the plaintiffs, and ordered the Louisville and Frankfort railroad company, out of the interest due and to become due on the bond which was executed by it to the state of Kentucky; and the Lexington and Frankfort railroad company, out of the dividends which should be thereafter declared in favor of the state of Kentucky, and become payable to the commissioners of the sinking fund, to pay to plaintiffs the sums respectively due them for interest, and also the interest thereafter accruing semi-annually, until the bonds sued on became due, and then they were to be paid in full.
From that judgment the commissioners of the sinking fund have appealed, and contend that the action cannot be maintained against them. The railroad companies also contend, as they did in the court below, that there is no existing available lien upon the road, under the mortgage which was executed to the city of Louisville to indemnify it for guaranteeing the payment of the bonds executed to the Northern Bank and to the Bank of Kentucky.
Numerous objections have been made to the judgment appealed from, which we will proceed very concisely to consider.
The bonds upon which this action is founded were not discounted by the banks, but the money was borrowed for a period of five years on the notes of the company, for the amount of the bonds, renewable every six months, and the bonds sued on were given to secure the payment of the notes thus discounted. This circumstance cannot, however, affect the right of the banks to recover the amount of the bonds, to be applied to the payment of the notes actually discounted. The supposition that the lapse of time had deprived the banks of the right to maintain an action on the notes which they discounted, and therefore that they had lost their remedy on the bonds sued on, when this action was commenced, is entirely erroneous. The notes *185 discounted are not embraced by any statute of limitations, nor was tbe time that elapsed after they became due before the action was gommenced, sufficient to create a presumption of payment; nor was payment thereof pleaded or relied upon as a defense; and even if the notes which were discounted by the banks were embraced by the act of limitations, and the remedy thereon barred by the statute, still as the debt has never been paid, and the bonds sued on are not yet due, we have no doubt that the action might be maintained on the bonds for the interest which is due, and for the principal when it becomes due. The right of the plaintiffs in the court below to obtain the relief which they sought, was not, therefore, in any manner, affected or prejudiced by the lapse of time.
By the act of 1838, the stockholders of the Lexington and Ohio railroad were required to signify their assent to, and to accept, its provisions, and it is contended that the evidence is insufficient to prove that this, requisition of the act was complied with.
The mortgage that was executed by the railroad company to the city of Louisville, contains a recital to the effect, that a meeting of the stockholders of said railroad company was held on Monday, the 21st day of May, 1838, at the office of said company in the city of Lexington, pursuant to a public notice for that purpose, at which it was resolved that the provisions of said act should be and were thereby accepted, a majority of all the stock voting in favor thereof.
The book which contained the proceedings of the company during that year has been lost, and could not be found, although a most diligent search was made for it. But Levi Tyler, who was then president of the company, proves that he wrote the mortgage to, the city of Louisville, and copied accurately from the books and papers before him the recitals which it contains; and although he was not present at the meeting of the stockholders referred to, he states he has no doubt that such a meeting of the stockholders took place, at which such proceedings were had as stated in the mortgage. If the book referred to could have been produced, the entries therein contained would have been evidence of the fact that the stockholders held a *186 meeting at the office of the company in Lexington, and resolved to accept the provisions of the act. And as the book has been lost, evidence of its contents is clearly admissible to establish that fact. The book was identified by the witness, and as it was present when the mortgage was drawn, and the witness is positive that he copied its contents accurately in the recitals in the deed, the evidence must be regarded as sufficient, especially after the lapse of so long a period, to prove that the stockholders of the Lexington and Ohio railroad assented to, and agreed to accept, the provisions of the act.
It is also contended that the city of Louisville is not bound by her guaranty of the bonds of the company, because no regular or legal vote of the citizens was taken on the subject. But the act of 1838 did not make the authority of the city to guaranty the bonds depend on the assent of the citizens. The corporate authorities had power under the act to guaranty the bonds, for and on behalf of the city, without any reference of the matter to the citizens. They did, however, refer it to a mass meeting of the citizens, and designated a time and place at which the meeting was to be held. The meeting was held as prescribed, at which there was a large majority in favor of the guaranty being made by the city, which was accordingly done. As the act of the legislature did not require the matter to be submitted to the citizens, nor, if submitted to them, prescribe any mode in which it should be done, the corporate authorities certainly had the power, if they thought proper to regulate their action on the subject by the will of a majority of the citizens, to prescribe the manner in which that will should be ascertained; and having done so, the guaranty is certainly no less obligatory upon the city than it would have been if made without any such submission. The reference to the citizens was made in order that the corporate authorities might have such an indication of the public will on the subject as would justify them, in their own view, in subjecting the city to such a heavy liability. They were satisfied with the manifestation which was made of the wish of the citizens in relation to the matter, and the reference, therefore, answered fully the purpose for which it was designed.
*187 But it is argued that the mortgage to the city of Louisville is invalid, because the company did not succeed in making sale of its bonds to an amount sufficient to enable it to complete the road.
It is very evident, from the provisions of the act of 1838, that the completion of the road was the object that the legislature intended to accomplish by its passage. To effect that object, the prior lien of the state was to be waived in favor of the mortgage which the company might execute under the act. But it is equally evident that the city of Louisville did, in good faith, agree to guaranty the bonds of the company to the amount authorized by the act. The city desired the completion of the road, and to effect that object, was willing to guaranty the bonds of the company to an amount which was supposed to be sufficient for that purpose.
Now, the question is, shall the city be deprived of its indemnity for the bonds which were sold by the company upon its guaranty, because the company was unable, or declined, to sell bonds sufficient to complete the road, although the city never refused to comply with its part of the agreement? An affirmative answer to this inquiry would result in such obvious injustice, that a construction which would lead to such a consequence should not be given to the act, unless imperatively required by a proper consideration of its provisions, and its obvious spirit and design.
No such construction is, in our opinion, required to be given to it. The company was authorized by it to issue bonds to a specified amount, but it was not required to do it. The very nature of the work to be accomplished demonstrated the propriety of selling the bonds from time to time, as the money to carry it on might be needed. The guarantor of the bonds of the company could not determine, from the provisions of the act, how many bonds the company would sell within the prescribed limit, nor when the sale of them would be made, but had a right to suppose, that so far as the guaranty extended, the mortgage would operate as an indemnity. If bonds to the amount of eight hundred thousand dollars guarantied by the city, had been sold by the company, and the money had been *188 expended on the construction of the road, but had proved insufficient for its completion, would, it have been contended by any one that the mortgage executed for the indemnity of the city was invalid, because the completion of the road, which was the principal object the legislature had in view in the passage of the act, had not been accomplished? If it would not, does not the same principle apply where the bonds guarantied and sold amount to forty thousand dollars only ? There is no actual difference between the two cases, inasmuch as the city, when it guarantied the payment of the forty thousand dollars, did not know but that it would be called upon, under its agreement, to extend its guaranty to the full amount of the nine hundred thousand dollars. If the city had violated its agreement by refusing to guaranty other bonds, or had prevented the company from making a sale of bonds which had been guarantied by it, there might be some reason for contending that it ought not to derive any benefit from the mortgage which had been executed for its indemnity. But as it acted throughout in good faith, and the mode of proceeding adopted by the company was in strict conformity with the provisions of the act under which both the company and the city acted, there is no good reason why the indemnity should not be available for the protection of the city to the actual extent of its guaranty.
Indeed, it might be argued with some plausibility that the failure to obtain the money under the act, for the completion of the road, was occasioned by the action of the legislature in repealing, in February, 1840, so much of the previous act as waived or postponed the lien of the state on its mortgage. It is true that up to that time the company had been unable to negotiate a loan upon reasonable terms; but if more time had been allowed, it might have succeded in obtaining the money and completing the road. Although this repealing act of the legislature was inoperative, so far as it was designed to affect any rights which had accrued and become vested under the act of 1838, nevertheless it had a prospective operation, and effectually prevented any further action under that act on the part of the company.
We are, therefore, of the opinion that the failure to raise *189 money enough to complete the road, did not render the mortgage to the city of Louisville wholly invalid.
Nor did the failure on the part of the city of Louisville, and the banks, to require the execution by the railroad company of a bond with security, that the money should be duly appropriated to the construction of the road, have that effect. The provision of the act authorizing the guarantor, or the lender of the money, to require the execution of such a bond, was evidently intended to confer a privilege, and not to impose an obligation. The property mortgaged, in its then condition, was an insufficient security for the payment of nine hundred thousand dollars; but if the money should be expended upon the road, the value of the security would be thereby enhanced, and, consequently, it was to the interest of both the guarantor and the lender that they should have a right, at their discretion, to demand the execution of such a bond. The money which was borrowed was all expended advantageously in the construction of the road; and for that reason the parties may have considered the execution of a bond unnecessary. If, however, the debt had been much increased, they might have deemed it proper to have required the execution of the bond.
It is also argued, that even if the mortgage to the city of Louisville be valid, still the lien it conferred cannot be enforced against the companies that now own the road; first, because the prior mortgage to the state contained a power to sell, which was legally exercised, and thereby all subsisting equities were extinguished, and a complete and unincumbered title vested in the purchaser; and, secondly, because the state, having the elder mortgage, the legal title to the property passed to the purchaser, and became vested in the present owners, without any notice of the equity attempted to be asserted in this action.
1. The exercise of the power to sell contained in the first mortgage, extinguished any equity of redemption which the mortgagor had at the time of the sale, and may have vested the purchaser with the legal title. But if it did, the execution of the second mortgage, with the assent of the state, and an express waiver of its prior lien, created an incumbrance upon *190 the property, that was not removed by the sale under the first mortgage. Indeed it is not clear that the legal effect of the waiver was not to vest the legal title in the second mortgagee, operating in the same way that a joint conveyance by the mortgagor and mortgagee would have done. Assuming, however, that the legal title still remained in the first mortgagee, and that a superior equity merely was created by the waiver in favor of the second mortgagee, that equity certainly could not be extinguished by a sale under the first mortgage. It is a mistake to suppose that the waiver of the prior lien in favor of the second mortgage, did not in any manner affect the power to sell contained in the first mortgage. The power still remained, and might be exercised, but only in subordination to the rights created by the execution of the second mortgage. The sale under the power could not have any greater effect than a sale would if it had been ordered by a court of chancery. Such a sale could not have prejudiced the rights of the second mortgagee, not being a party to the action. The waiver of the lien operated as a waiver of the right to sell, to the extent that .the lien itself was waived; and therefore the sale, although not expressly made subject to the mortgage to the city of Louisville, was so made in legal contemplation and in legal effect. Nor did the act of the legislature which directed the sale to be made, authorize it to be made under both mortgages, or in contravention of the rights of the second mortgagee, but only authorized it to be made under the mortgage to the state, and of course nothing passed to the purchaser at that sale but the title of the mortgagee, and any equity of redemption existing in the mortgagor at the time of the sale.
2. Conceding, for the sake of argument, that the present railroad companies are invested with the legal title to the property, and that the second mortgage conferred nothing but an equity, the question arises, do they occupy the attitude of purchasers for a valuable consideration without any notice of this outstanding equity?
. Notice of its existence was given by the city of Louisville at the time the sale was made under the first mortgage; but *191 tbat notice, although it might affect the purchaser at that sale, would not affect subsequent purchasers, who were not then present, and to whom it was not communicated.
But the act of the legislature of 1838, and the mortgage to the city of Louisville, which was recorded, were matters which the purchasers were bound to know, and which operated as constructive notice to them of the equity asserted in this action. The extent of the lien did not, it is true, appear on the face of the mortgage. But enough there appeared to put purchasers upon inquiry, which, if it had been made, would have resulted in furnishing them with a full knowledge of the extent of the lien claimed by the city. In addition, however, to this, the price which the Louisville and Frankfort railroad company was to pay for their part of the road still remains unpaid, and the consideration which the other company was to give was its own stock, the profits of which, as they accrue, are in its own hands. The principle, the protection of which has been invoked by the purchasers of the road, does not apply where the consideration has not been paid, and on this ground could not avail one of the companies, and might not avail the other. But this is not important, inasmuch as they are both affected by constructive notice of the equity now asserted against them.
It is contended, however, that the judgment, as rendered, cannot be sustained, because the city of Louisville did not answer, nor pray for a foreclosure of the mortgage which was executed for her indemnity; and, also, because the state cannot be sued, and the judgment, although nominally against the sinking fund, is in effect, and substantially, a judgment against the state, and is therefore unauthorized and erroneous.
In a court of equity, the holders of the bonds, for which the city of Louisville is bound on its guaranty, have a right to look to the property mortgaged, and have it subjected to sale for the payment of their demands. The mortgage to indemnify the city is in effect a security for the payment of the debt, and can be proceeded on as such by the creditor. And the right of the creditor to do so does not depend on the assent of the guarantor, nor upon the fact of the guarantor’s solvency or *192 insolvency. The creditor has a right to look to any and all the securities for the payment of his debt, by bringing the proper parties before the court. And as all the proper parties were before the court in this case, it was right, not only to subject the property mortgaged to the payment of the debt, but also, if not prohibited by some rule of law, to place the liability where, according to the principles of equity, it would finally devolve.
This brings us to the consideration of the most important question in the case, one which involves, not only the right of the railroad companies to any equitable claim against the state on account of this incumbrance on the property purchased by them, but also the power of the court to enforce such a claim, if it actually exist.
It is perfectly evident, from the several acts of the legislature in relation to the road, that it was claimed by the state as her absolute property, after it was purchased by her at the sale made under her mortgage, and that it was passed by her as such to the two railroad companies. The lien upon it, which was claimed by the city of Louisville, was disregarded and repudiated by the state, and the act of the legislature waiving its lien in favor of that created by the mortgage to the city, was expressly repealed by the act of 1840.
The sale of the road, therefore, to the two companies, was not made subject to the incumbrance that was upon it, but the road was sold as unincumbered property, and the question is, are the purchasers entitled to any relief on account of this incum-brance, inasmuch as they purchased the property without any covenant of warranty, and merely by a legislative conveyance ?
There is no implied warranty of title on the sale of real estate; but this rule of law does not dispense with the exercise of good faith in such sales, nor does it nullify or affect in any degree the equitable doctrine which requires the correction of a mutual mistake that operates prejudicially to one of the parties. Neither does it diminish the force of the principle by which the vendor is regarded, in every sale, as coming under an implied undertaking to his vendee, that he has a right to make sale of the thing which he attempts to transfer to him.
Although upon a sale of real estate without warranty the *193 vendor does not undertake that his title is superior to all others, yet he must have some title, and if he should incumber that title before he makes the sale, and does not sell subject to such incumbrance, he would be responsible, to the vendee for the amount the latter would be compelled to pay to remove it. This consequence results from the general doctrine that a vendor undertakes that he is the owner of that which he assumes to sell. Not that his title to the real estate, which is the subject of the sale, is the paramount title, but that the title which he claims belongs to him, and not to any other person. Good faith requires the application of this doctrine to all sales; and therefore it has been decided that a vendor, selling with special warranty only, is bound, notwithstanding his title may not be the elder legal title, to show that he has a title. (Bodley vs. McChord, 4 J. J. Mar., 476; Wilson vs. Jeffries, 4 J. J. Mar., 495.)
The state had consented to the execution of the mortgage to the city of Louisville, and became thereby instrumental in creating the incumbrance upon her own title. She assumed to sell her title to the railroad companies, as if no incumbrance existed upon it, and consequently good faith requires that she should make good that which she undertook to sell. Or, if all the partiés to the transaction acted under the erroneous belief that the city of Louisville had no available lien upon the road, this mutual mistake ought not to be allowed to prejudice the purchasers. It is very evident, as already remarked, that the existence of any such lien was not recognized by the state, and the probability is, was not regarded by it as being of any validity whatever. The railroad companies deny all knowledge of its existence; and although for certain purposes the law presumes them to have had notice, yet it is evident that they had no actual knowledge of it, and that the sale and purchase were made as if there had been no incumbrance upon the property. If, however, they must be regarded as having had legal notice of its existence, still, as the sale was not made subject to it, but was an absolute and unqualified transfer of the property, for a full and fair consideration, the title to which had been incumbered with the assent of the state, every principle of equity requires that the purchasers should be entitled to relief.' *194 The state was not the full proprietor of the title which it undertook to sell. The consideration which the purchasers agreed to pay for that title has, therefore, failed to the extent of the incumbrance upon it. That incumbrance it was the duty of the state to remove; and having failed to do it, the judgment of the court below appropriating to its payment the interest on the bond which was executed by the Louisville and Frankfort railroad company, and the dividends on the stock of the Lexington and Frankfort railroad company, which was transferred to the state, as the consideration for the transfer of the road, is correct, unless there be some principle of law which prohibits the giving of such relief.
This brings us to a consideration of the question of the power of the corn-t to apply this interest and these dividends to any other purpose than that to which they have been devoted by law, as a part, or at least what is claimed to be a part, of the sinking fund.
No action can be maintained against the state. The constitution provides, “ that the general assembly may direct by law in what manner and in what courts suits may be brought against the commonwealth.” {Article 8, section 6.) But the legislature has never passed any law upon the subject, nor authorized any action to be maintained against the state. If, therefore, an action against the commissioners of the sinking fund, for any cause whatever, is, as contended, substantially an action against the commonwealth, it is manifest that they are not liable to an action, and none can be maintained against them, unless it has been authorized by an act of the legislature.
The sinking fund was created by an act of the legislature passed in 1836, and by an act passed in 1840 the commissioners were empowered to “sue and be sued as other corporations.” By an act of 1846 they were regularly incorporated, and the usual corporate powers conferred upon them. It is evident, therefore, that the commissioners of the sinking fund are a corporate body, and as such, are liable to be sued, although as a corporation it is closely connected with the state in all its interests and functions.
' This court did not decide in the case of the Commissioners oj *195 the Sinking Fund vs. Theobald, (17 B. Mon., 476,) that no suit could be maintained against the commissioners of the sinking fund as a corporation; but, on the contrary, it was expressly admitted by the court, in its opinion, that such a suit might be maintained. It was only decided in that case that the commissioners were not liable for money which had been paid into the state treasury and placed to the credit of the sinking fund, when it was apparent that it had been appropriated by them to the purposes for which the fund was created, and that no part of it was under their control, or remained unexpended when the suit was instituted. The principle settled in that case has, however, no application in this. Here the fund in contest has not been paid into the state treasury, nor actually become a part of the sinking fund. The question is, not whether the commissioners of the sinking fund are liable for it, but whether they have such a right to it under the law as precludes the plaintiffs from insisting on its appropriation to the payment of their demands.
. By the act creating the sinking fund, the faith of the state was ‘pledged that it should be devoted to the purpose of paying the interest on loans made for works of internal improvement, and for the final redemption of the debt. And the 34th section of article 2 of the Constitution provides, “that the general assembly shall have no power to pass laws to diminish the resources of the sinking fund.” Hence it is argued, that as the bond which was executed to the state by the Louisville' and Frankfort railroad company, and the dividends to which the state was entitled on the fiften hundred shares of stock in the' Lexington and Frankfort railroad company, were dedicated by the legislature to the sinking fund, they cannot be applied to any other purpose whatever, and that on this ground the judgment of the court below was unauthorized and illegal.
If, however, the state was not entitled to the whole amount of the bond, and to the dividends on said'stock as they might accrue, but the same were liable to an abatement, in consequence of the incumbrance which was on the property which had been transferred to the railroad companies, then it is man-fest that the dedication to the sinking fund of that part thereof to *196 which the state was not entitled was wholly nugatory and inoperative. The act of the legislature could not transfer to the sinking fund that 'which did not equitably belong to the state. The question therefore is, not whether the court had power to oppro-priate a part of the sinking fund to any other purpose than that to which it has been devoted by law, but whether the fund in contest does actually constitute a part of the sinking fund. This is a matter that may be litigated with the commissioners of the sinking fund. It is not a matter which involves their individual responsibility, or that affects in any degree anything which is admitted to be a part of the sinking fund, but proposes merely to contest their right to demand and receive so much of the consideration which the railroad companies agreed to pay to the state for the road, as may be necessary to discharge the existing incumbrance on the property. For this purpose the suit can be maintained against the commissioners of the sinking fund. The road is liable for the payment of the debts secured by the mortgage to the city of Louisville. The purchasers of the road are in equity entitled to an abatement out of the purchase money, of a sum sufficient to remove the incum-brance. To this extent they have a right to contest the claim of the commissioners of the sinking fund to the purchase money. It is a proper subject of controversy between them, the question being whether or not it legally constitutes any part of the sinking fund. We think it does not, because the state not being itself in equity entitled to it, could not invest the sinking fund with a right to it. If the railroad companies are compelled to pay the debts secured by the mortgage to the city of Louisville, they have a right to retain the amount thus paid out of the price they agreed to pay for the property; and this right is as available against the commissioners of the sinking fund as it would be against the state, if the interest and dividends still belonged to it, and it was asserting a claim to them. It was proper therefore to determine the whole matter in this action, and to place the liability where, according to equitable principles, it would eventually devolve.
Although no suit can be brought against the state, yet if it was asserting a claim against the railroad companies for pay *197 ment of the purchase money, the defendants might in such an action deny their liability for the whole amount of it, and insist on their right to retain so much thereof, as was necessary to remove the incumbrance that was on the property. The same defense might be relied upon if the action were brought by the commissioners -of the sinking fund. And as they can be sued, they may be made defendants in an action, in which the right of the sinking fund to the subject-matter in litigation is called in question. In that respect there exists a difference between a claim asserted by the state and one asserted by the commissioners of the sinking fund. The former can only be litigated by way of defense; the latter may be litigated by an action brought for that purpose.
The commissioners of the sinking fund were therefore properly made defendants in this action, and the judgment settles and determines the rights .of the parties according to the equity and justice of the case.
Wherefore, the judgment is affirmed.