BOSTON FOOD PRODUCTS COMPANY *vs.* WILSON AND COMPANY.

Suffolk.    March 28, 29, 1923. — June 5, 1923.

Present: RUGG, C.J., BRALEY, DECOURCY, PIERCE, & CARROLL, JJ.

*Res Judicata. Judgment. Estoppel. Contract,* Performance and breach. *Evidence,* Of agency. *Agency,* Scope of authority. *Practice, Civil,* Conduct of trial: order of proof; Exceptions.

An action by a corporation, a dealer in sausage meat, against another corporation, a manufacturer of the meat, for breach of an alleged contract by the defendant to deliver five hundred thousand pounds of the meat to the plaintiff at $15.75 per hundred weight was tried at the same time with an action by the manufacturer against the dealer upon an account annexed for meat delivered, items before March 31 being charged at $15.75 per hundred weight and items after that date at $20.50 per hundred weight. The dealer contended that on March 31, when a large part of the five hundred thousand pounds had not been delivered, the manufacturer refused further to be bound by the contract. The manufacturer contended that it was not bound by the price of $15.75 after March 31. There also was evidence tending to show that credits given by the manufacturer to the dealer in its account annexed were larger than those claimed by the dealer, and that invoices sent by the manufacturer to the dealer after April 1 bearing the price $20.50 per hundred weight were returned to the manufacturer, which corrected them to read $15.75 per hundred weight. At the close of the evidence, by consent of the dealer, in the action against him a verdict was entered for the manufacturer for the amount claimed in the account annexed and interest. The other action was submitted to the jury, who found for the dealer, and in that action the manufacturer alleged exceptions. *Held,* that

(1) Aside from other possible reasons, which were not discussed, the fact that there had been no judgment in the action of the manufacturer against the dealer prevented the question of the price to be paid after

April 1 from having become *res judicata* on account of the verdict entered by consent;

(2) The consenting to the verdict in the circumstances did not estop the dealer from contending that the price was not changed after April 1.

At the trial of the action above described, there was evidence tending to show that an authorized agent of the defendant assented in oral negotiations to an agreement to supply approximately five hundred thousand pounds of sausage meat to the plaintiff at $15.75 per hundred weight, deliveries to be fifteen thousand pounds a day; that this rate would have taken performance of the contract beyond April 1; that the defendant stated to the plaintiff that he would not promise to get out fifteen thousand pounds a day but that "he would get all he could out;" that the defendant delivered only one hundred forty-one thousand, five hundred and forty-six pounds and on March 31 refused further deliveries at $15.75 per hundred weight. *Held*, that a verdict for the plaintiff for the difference between the contract price of the undelivered quantities of the meat and the market price on March 31 was warranted.

At the trial of the action above described, an issue was, whether the agent, who acted for the defendant in the negotiations as to the contract, had authority to make the contract. There was evidence tending to show that he was manager of the defendant's plant in Cambridge, that he had complete charge of the plant, that he made sales and that he had salesmen under him; that he wrote to the plaintiff in the course of the negotiations a letter signed in the defendant's name, and later sent, so signed by him, the letter refusing to be bound to the price of $15.75. *Held*, that a finding was warranted that the agent was held out by the defendant as its agent and as one clothed with ostensible authority to deal with the defendant in the matters in question.

The order of proof at a trial is within the control of the presiding judge in the exercise of his discretion; and, at the trial above described, it was proper for him to receive testimony as to negotiations with the defendant's alleged agent before the agent's authority was shown and no harm was done to the defendant by such admission, evidence of the authority being introduced afterwards.

Evidence of limitations expressly made by the defendant upon the authority conferred upon its agent was inadmissible where it did not appear that the plaintiff had notice or knowledge of such limitations.

Copies of the by-laws of the defendant, a foreign corporation doing business in this Commonwealth, filed with the commissioner of corporations and taxation and showing limitations upon the power of its agent, were not admissible to prove such limitations where it did not appear that the plaintiff knew of the by-law.

At the trial above described, it appeared that the agent of the defendant in its name wrote to the plaintiff on February 18, setting forth an offer to sell daily ten thousand pounds of sausage meat at $15.75 per hundred weight during the balance of February and March. Evidence tended to show that later negotiations, including a letter of the plaintiff to the defendant on February 26, resulted in an agreement by the defendant through the agent to sell "approximately five hundred thousand pounds" of the meat at that price, deliveries being at the rate of about fifteen thousand pounds daily. The agent testified that the agreement at $15.75 per hundred weight

expired on March 31, at a time when only one hundred and forty-one thousand five hundred and forty-six pounds had been delivered, and that he " figured " that the letter of the plaintiff to the defendant on February 26, in further negotiations after his letter of February 18, had no bearing on the contract. Subject to a general exception by the defendant, testimony was admitted of statements made by the agent on March 1, in speaking of the agreement of the plaintiff and the defendant, that he had a contract for "five hundred thousand pounds of sausage at $15.75." *Held,* that, while such statement was inadmissible as an admission binding the defendant, it was admissible to contradict the other testimony of the agent; and that the exception, being general, must be overruled.

CONTRACT for breach of an alleged agreement by which the defendant agreed to deliver to the plaintiff five hundred thousand pounds of sausage meat at the rate of fifteen thousand pounds per day for the price of $15.75 per hundred weight, it being alleged that the defendant had delivered only one hundred forty-one thousand, five hundred and forty-six pounds. Writ dated August 22, 1919.

In the Superior Court, the action was tried before *Raymond,* J., at the same time with an action of the defendant in this action against the plaintiff, in which the writ was dated November 21, 1921, and the declaration contained two counts. Only the first count in that action was material. That count was for $3,792.13 upon an account annexed containing twenty-seven items dated previous to April 1, 1919, of designated numbers of pounds of " Frankfurts " at $15.75 per hundred weight and amounting in the aggregate to $16,857.80, and also seven items dated from April 2 to April 8 of the same character, at $20.50 per hundred weight, amounting in the aggregate to $4,642.27. The account also showed credits preceding April, 1919, amounting to $9,857.24 and after that date amounting to $7,650.70. There was testimony at the trial, admitted subject to exceptions by Wilson and Company, that invoices submitted after April 1 for goods delivered by Wilson and Company to Boston Food Products Company after that date, which originally bore the price $20.50 per hundred weight, as stated in the account annexed above described, were at the request of the president of the Boston Food Products Company changed to state the price as $15.75 per hundred weight.

Other material evidence is described in the opinion. At the close of the evidence the defendant moved that a verdict be ordered in its favor.

By agreement of counsel for the Boston Food Products Company, the judge instructed the jury to return a verdict for the plaintiff in the action by Wilson and Company against Boston Food Products Company for $3,924.85 on the first count of its declaration, and for the defendant Boston Food Products Company on the second count of the declaration in that action.

In the main action, the jury found for the plaintiff in the sum of $17,819.05. The defendant filed a motion that the verdict be set aside and that a new trial be ordered for the following reasons: (1) because the verdict was contrary to the evidence and the weight of the evidence; (2) because the verdict was contrary to law; (3) because the judge erroneously declined to allow the defendant's motion to order a verdict for the defendant; (4) because the verdict was contrary to and inconsistent with any known rule of damages; (5) because the judge declined to give certain requests for rulings made by the defendant; (6) because of the erroneous admission of evidence as to the authority of the defendant's agent offered by the plaintiff and the exclusion of such evidence offered by the defendant; (7) because of the erroneous admission of evidence of the plaintiff of written correspondence between the witness Heyer and the plaintiff; (8) because of the erroneous exclusion of evidence offered by the defendant of a public record. The motion was denied.

The defendant alleged exceptions.

*A. L. Taylor,* (*F. J. Johnson & C. P. Richardson* with him,) for the defendant.

*W. L. F. Gilman,* (*A. L. Cleveland* with him,) for the plaintiff.

CARROLL, J. The Boston Food Products Company (hereinafter called the plaintiff) in its action against Wilson and Company (hereinafter called the defendant) recovered damages for the breach of a contract to sell and deliver five hundred thousand pounds of sausages at $15.75 per hundred

weight, in the sum of $17,819.05. By agreement of the parties the jury returned a verdict for the defendant in its cross action in the sum of $3,924.85 on the first count of its declaration, for sausages delivered to the plaintiff at $20.50 per hundred weight, this count being on an account annexed for money due, with interest.

The defendant in February, March and April, maintained a plant in Cambridge for the manufacture of sausage, and during this time R. H. Heyer was the manager. One of the questions involved in the controversy is his authority to make the contract relied on by the plaintiff. John C. DeMille, president of the plaintiff corporation, testified that in February, 1919, he learned that bids were to be opened for the supply of sausage for the United States Quartermaster's Department of the army. February 15, he went to the defendant's place of business. He testified that he saw on the building the defendant's trade mark and a sign bearing the name of Wilson and Company. He there met Heyer who was in charge of the defendant's plant, and told him that he had never bid " on sausage for the government before" and "was anxious to bid." Under date of February 18, 1919, the plaintiff received a letter from the defendant, written on the stationery of Wilson and Company, signed "R. H. Heyer Wilson & Company" setting forth an offer to sell daily ten thousand pounds of sausage at $15.75 per hundred weight during the balance of February and during the whole month of March. On February 24, 1919, DeMille again visited the defendant's place of business and presented a letter dated February 26, 1919, (hereinafter spoken of as Exhibit 2) from the plaintiff to the defendant; it stated in substance that the plaintiff had taken an order from the Quartermaster's Department, U. S. A. for approximately five hundred thousand pounds of sausage, " Your price to us to be $15.75 per cwt., delivered at our plant. . . . Quickness of delivery was one of the prime factors reckoned upon. . . . This means we will require about 15,000 lbs. of Sausage a day, the deliveries to begin just as soon as the empty cans arrive, which we expect will be in a week or ten days. . . . Regarding payment, our sale . . . is to the Quartermaster

Department. . . . They aim to pay in about ten days from delivery, which means practically fifteen days. We agree in turn to pay you promptly when we receive payment. We will let you know in due time the probable date of arrival of cans so that we may begin." The letter also stated that, in order to help the defendant to " get your capacity up to 15,000 lbs. a day, we are ready to loan you either one, or both, of our chopping machines; " and offered if the motor attached was not of right voltage to supply another motor. There was evidence that Exhibit 2 was delivered to Heyer, who after reading it said: " This is all right, except that I did not agree to deliver this at your plant." After some discussion of this question it was agreed, according to the testimony of DeMille, that the plaintiff should, at its expense, carry the goods from the defendant's plant and that Heyer, referring to the place of delivery, said: " Otherwise the letter is all right and confirms our understanding with you. . . . Of course the Credit Department will have to pass on the credit, but I have no doubt that that will be all right." A letter dated February 26 (hereinafter called Exhibit 3), addressed to the defendant's credit department, from the plaintiff, was left with Heyer. This letter referred to the order given the defendant and stated that the plaintiff's quick assets were $75,000; it also referred to the Metropolitan Trust Company and concerns in the trade. In consequence of Exhibit 3, a telephone call was received from the defendant's credit department by the plaintiff's president.

On March 25 or 26, 1919, the plaintiff received a letter from the defendant, dated March 25, which stated: " As our agreement runs out, Monday, March 31st., on the price of $15.75 per cwt., would like to know whether you want us to figure on price for April " (Signed) " Wilson & Company." Under date of March 27 the plaintiff replied denying that the contract expired March 31 at the price of $15.75 per cwt., and calling attention to Exhibit 2, and to the facts that there was no other contract, that the defendant had been since March 13 delivering sausage in pursuance of the terms of this letter, and that the defendant's deliveries to date were very much behind. In answer thereto a letter was received

from the defendant terminating the contract ending March 31, and calling the plaintiff's attention to the agreement of February 18. There was also evidence from the government inspectors who visited the defendants daily while the contract was in existence, that Heyer was the manager of the plant and was the one to whom complaints were made. There was evidence that the market price for sausages about April 1 was about twenty cents per pound.

The defendant's district manager testified that Heyer had no authority to make the contract in question. It appeared that on cross-examination he answered to the question whether Heyer was director of sales in Cambridge, " yes " and " no," and explained this saying, " occasionally we made small sales, but probably ninety-eight per cent of the business were branch transfers," and that this sale to the plaintiff was not a branch transaction. Heyer was called by the defendant and in direct examination testified that he was manager of the defendant's plant and was in charge until April 15, 1919; that he did not remember stating to DeMille that Exhibit 2, other than the question of cartage, accurately embodied his understanding of the agreement between him and DeMille; that when the letter (Exhibit 2) was handed to him, DeMille said he would require five hundred thousand pounds, and that to facilitate the defendant in " getting this out he would install some machinery, which he did." Heyer also testified that he said at this conversation that he did not think he " could get out fifteen thousand pounds a day; " that he did not remember that anything was said about the price at that time, and further that " He did know that the letter was handed to him and the price was embodied in there, and that he didn't take any objections to it; that the only thing he took exceptions to was the cartage; " that he read the letter and noticed the price in it, " but did not think it had any bearing on the agreement, that he made," and on being asked why he sent the letter of March 25, replied, " as I figured our agreement run out after the thirty-first day of March, and to figure on a new price for April." On cross-examination he testified that when Exhibit 2 was handed

to him, he glanced over it, and " knew that it said five hundred thousand pounds approximately, . . . ' your price to us to be $15.75 per hundred weight delivered at our plant;" that his only objection was to the place of delivery and that " he made no objection to the five hundred thousand pounds or no objection to the $15.75." He further testified that as manager of the Cambridge plant he had charge of the business there and was the head man in charge of the plant and had charge of " the operations and the handling of the product; " that he had salesmen who operated " peddler wagons " and in answer to the question whether it was a part of his duty to make sales replied " we always try to make sales, to get the business."

The defendant's motion for a directed verdict was denied; and after the verdict for the plaintiff it filed a motion for a new trial, which was also denied. The case is before us on exceptions to the denial of these motions and to the admission and exclusion of certain evidence.

The first contention of the defendant is that by reason of the plaintiff consenting to the verdict for the defendant on the first count of its declaration in the cross action, all the issues in the case are disposed of and it is *res judicata* against the plaintiff. As stated by the defendant in its brief, " the plaintiff's consent to a verdict against it in the cross action now forever estops it from questioning the correctness of all elements which went to make up that verdict on the merits of the case." The plaintiff contended that the contract with the defendant required it to deliver five hundred thousand pounds of sausage at $15.75 per hundred weight, according to Exhibit 2. The defendant's bill of items, on its first count, contains thirty-four items of deliveries, beginning February 25, 1919, and ending April 8; and thirteen credit items showing a balance of $3,792.13. All the deliveries, including those of March 27, were at $15.75 per hundred weight. The deliveries in April, seven in number, were at $20.50 per hundred weight. The total credits aggregated $17,507.94. The plaintiff's testimony tended to show that the total paid by it was $16,753.15. The plaintiff also introduced in evidence four invoices of sausage delivered in

April at $15.75 per hundred weight. The entering of a verdict for the defendant in its cross action, where the April deliveries were charged at $20.50 per hundred weight, did not, as claimed by the defendant, forever settle between the parties that the price of the sausage to be delivered after April was at the price of $20.50 per hundred weight. The verdict of the jury did not render the matter of price *res judicata.* The foundation of the rule of *res judicata* is that when a final verdict or decree has been entered on the merits of the case by a court of competent jurisdiction, the judgment or decree is conclusive. " The doctrine of *res adjudicata* is plain and intelligible, and amounts simply to this, that a cause of action once finally determined, without appeal, between the parties, on the merits, by any competent tribunal, cannot afterwards be litigated by new proceedings either before the same or any other tribunal." *Foster* v. *Busteed,* 100 Mass. 409, 412.

The principle of *res judicata* cannot be invoked unless the matter has been finally settled by a judgment or decree of the court. When the case was on trial, no judgment had been entered on the cross action and the verdict by consent, in favor of the defendant in its cross action, did not bar the plaintiff from prosecuting its action for breach of the contract to furnish it with five hundred thousand pounds of sausage. Neither the price at which the merchandise was to be supplied under the contract nor the measure of damages was *res judicata,* and the plaintiff was not barred from proceeding with its action. See *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow,* 203 Mass. 159, 203, 220, where the principle of *res judicata* is discussed and the authorities collected. See also *Foster* v. *Busteed, supra; Fuller* v. *Metropolitan Life Ins. Co. of New York,* 68 Conn. 55, 64. A judgment not being entered, it becomes unnecessary to consider the other objections which might be urged against this contention. See in this connection, *Minor* v. *Walter,* 17 Mass. 237; *Burlen* v. *Shannon,* 99 Mass. 200; *Nashua & Lowell Railroad* v. *Boston & Lowell Railroad,* 164 Mass. 222; *Newhall* v. *Enterprise Mining Co.* 205 Mass. 585. Neither was the plaintiff estopped from proceeding with its action for

breach of the contract by consenting to the verdict for the defendant. The elements of estoppel are lacking. The defendant was not misled by the plaintiff nor induced, by the plaintiff's consenting to a verdict against it in the cross action, to do what it otherwise would not have done or to abstain from doing what it would have done. *E. B. Harman & Co.* v. *William Filene's Sons Co.* 232 Mass. 52. There was no error in refusing the defendant's motion for a directed verdict in its favor.

It does not appear that special requests for rulings were asked for, and no exceptions were taken to the judge's charge. The jury could have found that the market value of the goods on April 1, 1919, was approximately twenty cents a pound; that the contract was broken by the defendant's letter of March 27, 1919, notifying the plaintiff " of the termination of our agreement ending March 31; " and that while the contract called for fifteen thousand pounds of sausage each day, it also required the defendant to supply five hundred thousand pounds of sausage. The jury may have believed the testimony of Heyer to the effect that he would not promise to supply that amount each day; that " he would get all he could out; " that he told DeMille, " I don't think I could get out fifteen thousand pounds a day." His testimony may have been considered in connection with the statement in Exhibit 2, tending to show that the plaintiff was willing to help the defendant get out this amount daily by loaning its own machines. The jury could have found that the daily supply was not insisted on by the plaintiff; they were authorized to find that the contract required the defendant to supply five hundred thousand pounds, and the contract was not fulfilled until this amount was supplied; and that as the defendant broke the contract, the plaintiff could recover. It could have been found that this was not merely a contract to deliver goods in instalments, where damages for the breach are based on the difference between the contract price and what they would have been worth at the time and place specified. It could have been found that the contract to supply the goods was broken by the defendant on March 31, and the evidence showed that about

that time the market value was approximately twenty cents a pound.  See *Antonacopoulos* v. *Arax Grocery Co.* 234 Mass. 125.

There was evidence tending to show that Heyer had authority to make the contract in question.  He was manager of the defendant's Cambridge plant; he wrote the letter of February 18, 1919, agreeing to make for the plaintiff ten thousand pounds of sausage a day at $15.75 during February and March.  The cross action was based in part on this letter and in part on conversations between the plaintiff and Heyer.  There was evidence that he had authority to write this letter and enter into this contract.  He also sent the letter of March 25, saying that the contract expired March 31, and asking for figures for the month of April. The jury might well have found that he was authorized to make the contract in question.  His own testimony showed that he had complete charge of the plant, that he made sales and had salesmen under him and was held out by the defendant as its agent, as one clothed with ostensible authority to deal with the defendant.  See *Lobdell* v. *Baker*, 1 Met. 193; *Brooks* v. *Shaw*, 197 Mass. 376, 380; *Rintamaki* v. *Cunard Steamship Co. Ltd.* 205 Mass. 115, 117; *Parrot* v. *Mexican Central Railway*, 207 Mass. 184.

The testimony of DeMille of his conversations and dealings with Heyer before the authority of the latter was shown, affords no ground for sustaining the defendant's exception to this evidence.  Heyer's authority was subsequently shown, *Sanford* v. *Orient Ins. Co.* 174 Mass. 416, 422, and the order of proof was within the discretion of the court.  *Hall* v. *Bates*, 216 Mass. 140, 143.  *Lowell Trust Co.* v. *Wolff*, 223 Mass. 168.

The defendant offered to show what Heyer's duties were as manager of the defendant's business at Cambridge.  This evidence was excluded properly.  As between plaintiff and defendant, it was immaterial what the extent of Heyer's express authority was, if the defendant permitted him to exercise an authority not expressly given him, and the plaintiff was led to deal with him as one having the authority which he purported to have.  *Produce Exchange Trust Co.*

v. *Bieberbach,* 176 Mass. 577.    *Rintamaki* v. *Cunard Steamship Co. Ltd. supra.    Hall* v. *Bates, supra.    Danforth* v. *Chandler,* 237 Mass. 518.

There was no error in excluding the copy of the defendant's by-laws constituting a part of the public records in the office of the commissioner of corporations and taxation; even if it be assumed, without deciding, that as the defendant was a foreign corporation a copy might be introduced if otherwise admissible.    The by-law relied on provided that " a local manager or agent had no power to make contracts binding upon Wilson and Company without the ratification of the Chicago office."    There was no evidence that the plaintiff knew of this by-law.    In *Produce Exchange Trust Co.* v. *Bieberbach, supra,* an exception was taken to the exclusion of the by-laws of a corporation requiring " ' checks or other instruments for the payment of money ' to be signed by the president and countersigned by the treasurer."    It was said in that case at page 582: " The existence of such a by-law could not affect the rights of the plaintiff as the holder of a note signed by the officers, within the apparent scope of the power which the corporation held them out as having, by paying notes signed like those in suit."    The by-law was not admissible to show that Heyer's authority was different from the apparent authority which he exercised in the conduct of the defendant's business.    *Hartford* v. *Massachusetts Bowling Alleys, Inc.* 229 Mass. 30.

The defendant excepted to the evidence of James E. Maloney and Walter J. Murphy.    They testified that " about March 1 " Heyer had a conversation with Maloney in which Heyer said, in speaking of the agreement of the plaintiff and defendant, that he (Heyer) had a contract for " five hundred thousand pounds of sausage at $15.75."    There was evidence for the jury that Heyer was the defendant's general manager and authorized to make the contract in question, but the admissions of a general manager, which are not made in the performance of his duty as such manager, are not admissible against his principal.    *Wellington* v. *Boston & Maine Railroad,* 158 Mass. 185.    *Gilmore* v. *Mittineague Paper Co.* 169 Mass. 471.    *Brackett* v.

*Commonwealth,* 223 Mass. 119, 127.   Heyer however was a witness for the defendant and the letter of March 25, 1919, which was sent to the plaintiff by Heyer was in evidence; it stated that the agreement with the plaintiff expired on March 31.   The five hundred thousand pounds of sausage called for by the contract on which the plaintiff relied, had not been supplied.   The statements in the letter as well as the testimony of Heyer that " he figured " Exhibit 2 had no bearing on the contract of February 18 could be contradicted by competent evidence, and the defendant could introduce admissions made by Heyer contrary to the statements in the letter and to his evidence at the trial.   The defendant specified no particular ground for excluding the evidence; its exception was a general one.   It does not appear from this record for what purpose the evidence of Maloney and Murphy was offered.   The case was tried together with the defendant's cross action, and if the evidence was competent in any aspect of the case, the exception cannot be sustained.   It may have been offered to contradict Heyer, and in this aspect the evidence was admissible. *Worrell* v. *Baldwin Chain & Manuf. Co.* 222 Mass. 355. See *Commonwealth* v. *Fenno,* 134 Mass. 217.

We discover no error in the conduct of the trial.   There was no error of law in overruling the motion for a new trial. *Lopes* v. *Connolly,* 210 Mass. 487, 495, 496.

*Exceptions overruled.*