**GOTTLIEB et al.**
v.
**ISENMAN et al.**
No. 4836.

United States Court of Appeals, First Circuit.
Aug. 2, 1954.

Rehearing Denied Aug. 27, 1954.

Jacob S. Aronson, Boston, Mass., for appellants.

Herbert Burstein, New York City (William Q. Keenan, Boston, Mass., on the brief), for appellees.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment entered in the United States District Court for the District of Massachusetts on March 4, 1954, granting the defendants' motion for summary judgment.

The complaint may be summarized as follows: The plaintiffs Arthur Gottlieb and Michael Pariser are citizens of New York. The defendants George A. Isenman and Manuel Isenman are citizens of Massachusetts and the defendants Beacon Chemical Industries, Inc., is a Massachusetts corporation. Jurisdiction is based on diversity of citizenship and the required amount. From about January, 1942 until about June 30, 1950, the defendants George Isenman and Manuel Isenman jointly operated a business known under the name of The Beacon Company of Boston which was set up as a sales outlet for some or all of the products of the defendant corporation. The president of the corporation is Manuel Isenman and its treasurer and clerk is George Isenman. They own or control all the shares of the corporation. In 1949, the individual defendants and the defendant corporation were engaged in the business of manufacturing and distributing chemicals of various kinds, including wax products known by the trade name of Beacon Wax. Pariser went to Boston on or about December 24, 1949 and met George Isenman and one Cecil Landau who was represented to be the sales manager for the Beacon Wax Products. George Isenman, acting in behalf of the co-partnership and the defendant corporation, asked Pariser to find a customer to purchase the entire wax products business of the defendant for a total sales price of five million dollars, of which twenty per cent must be a down payment and the balance to be paid over a period of not more than three years. He also offered Pariser and Gottlieb a commission of five per cent of the total sales price if they produced a customer. Pariser, acting on behalf of himself and Gottlieb, agreed with the defendants to use their best efforts to produce a customer on the terms and for the commission as stated above. As the result of their efforts, the plaintiffs pro-

duced as a customer the June Dairy Products Co. which was ready, willing and able to purchase the wax products business upon the terms and under the conditions previously agreed upon by the parties. Also, as a result of the efforts of the plaintiffs, the defendant George Isenman and Cecil Landau met and conferred with Louis Bandler, president and treasurer of June Dairy Products Co. in New York City on or about March 3, 1950. Bandler informed the defendants that his company was ready, willing and able to buy the wax products business upon the terms set by the defendants. The complaint further alleges that in bad faith and without reasonable justification, the defendants and their agents failed, neglected, and refused to disclose to Bandler the financial statements covering the wax products business, even though Bandler was ready then and there to make a definite commitment in behalf of his company.

The defendants' answer admits that Pariser met Cecil Landau and George Isenman on or about December 24, 1949 in Boston and that George Isenman and Landau met Louis Bandler in New York on or about March 3, 1950, but denies the other material allegations of the complaint. After many depositions had been taken by the parties, the defendants filed a motion for summary judgment on January 11, 1954. The plaintiffs filed an affidavit of Louis Bandler made on July 8, 1953 in opposition to the motion. The motion was granted and this appeal followed.

■ The district court would be warranted in granting the defendants' motion for summary judgment if the pleadings, depositions, and affidavit of Louis Bandler show " * * * that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. * * " Rule 56(c), Fed.Rules of Civ.Proc. 28 U.S.C.A. The plaintiffs have a right to a trial " * * * where there is the slightest doubt as to the facts." Peckham v. Ronrico Corporation, 1 Cir., 1948,

171 F.2d 653, 657; Landy v. Silverman, 1 Cir., 1951, 189 F.2d 80.

■ The defendants contend that, even assuming the existence of the brokerage agreement, they are entitled to summary judgment because the alleged buyer as a matter of law could not and did not accept the alleged offer to sell. Under the rule of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, we look to the Massachusetts decisions in order to determine the law governing the validity of this contention. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. Since the alleged brokerage contract was made in Massachusetts and its performance was not contemplated in any particular state, a Massachusetts court would apply its own law to determine the rights and duties of the parties under the alleged contract. Wetherell Bros. Co. v. United States Steel Co., 1 Cir., 1952, 200 F.2d 761, and the Massachusetts cases cited therein.

In Fitzpatrick v. Gilson, 1900, 176 Mass. 477, 478, 57 N.E. 1000, the court stated: " * * * When a broker has found a customer for that for which his principal has employed him to find a customer, the broker has performed his duty, and has earned his commission; or, as the proposition is usually stated, if the person produced by the broker is able, ready, and willing to buy, sell, or lend, as the case may be, the broker's commission is earned. * * * " If the broker does produce a customer able, ready, and willing to buy on the seller's terms, then the broker's "right to a commission is not affected by the failure of a customer and seller to enter into a binding agreement, or by the refusal of the seller to carry out the transaction." Drake v. Sweet, 1950, 325 Mass. 542, 545, 91 N.E.2d 346, 347, 348.

Louis Bandler stated in his deposition that June Dairy Products Co. is a wholly owned subsidiary of Blue Moon Foods, Inc. Under the terms of a loan agreement with the Provident Mutual Life Insurance Company, June Dairy Products

Co. and Blue Moon Foods, Inc. had agreed not to incur any indebtedness without the written consent of Provident. No such consent had been obtained on or before March 3, 1950. The defendants therefore contend that the alleged buyer was not able, ready, and willing to purchase because the consummation of the purchase was dependent upon arrangements which had to be made with Provident and other financial institutions.

In Driscoll v. Bunar, 1952, 328 Mass. 398, 401, 103 N.E.2d 809, 812, the court stated: " * * * The plaintiff was not obliged to show that Kennedy had the necessary cash in his possession or in a bank, for one may be financially able if from his own resources, or on his own credit or on the security of the property he is to purchase, he will be able to command the necessary funds when the time comes for the completion of the transaction. * * * "

Louis Bandler testified in his deposition as follows:

"A. * * * We had a choice of taking the money from the Provident Mutual, who wanted to give us two million dollars, or work with Goldman-Sachs. * * *

* * * * * *

"Q. In other words, Mr. Weinberg of Goldman-Sachs indicated to you that if you had a proposition which required more than two million dollars, Goldman-Sachs might or would— A. He said he would be very happy to.

"Q. —would be very happy to help finance the deal and serve on your board? A. That's right.

* * * * * *

"Q. So that by March 3, 1950, in any event, you had not made any arrangements specifically with anybody to get any money for the Beacon deal? A. We knew we had the money within our own people or could get it from outside sources. That we knew definitely.

"Q. You knew that you could get how much money? A. I could get up to ten million dollars from Jason F. Whitney.

"Q. For the Beacon deal? A. For any business deal.

"Q. Well, for the Beacon deal? A. The Beacon deal, he was more excited about it than I was.

"Q. And did he offer the ten million dollars for it? A. He said, 'If it needs financing, I will take care of it.'

* * * * * *

"A. * * * When I told him there is a company named Beacon Wax, earning one million net and wants five million dollars. He said, 'Beacon Wax is a great outfit. They are going places. Get it in, Louis. I will take care of the financing.'

"Q. In other words, Mr. Whitney indicated to you that if you could buy the Beacon Wax Company for five million dollars, he would arrange the necessary funds, is that correct? A. He would.

"Q. You could get the whole five million dollars? A. Whatever money was needed for the transaction.

* * * * * *

"Q. So that the manner of financing the thing would be a decision to be made by the Board of Directors? A. Yes. That is just mechanics. Shall we get it from the private bankers, or shall we raise the money ourselves, or through our own stockholders, with rights? We had any number of ways of doing it.

* * * * * *

"A. * * * With the Provident Mutual, we would have gone to them with the Beacon deal, and if they approved it, fine. If they didn't approve it, we could retire their loan and do it anyway.

* * * * * *

"Q. In other words, if Provident Mutual refused the Beacon deal, then you could retire their loan and do the deal on your own? A. Yes.

"Q. In other words, if a deal which your company wants to make is not approved by the Provident Mutual, you have the option of paying off the outstanding indebtedness and going ahead with the deal? A. That's correct."

We believe that on the basis of this testimony a genuine issue of fact exists as to whether or not June Dairy Products Co. and Blue Moon Foods, Inc. were financially able, ready, and willing to purchase on the alleged sellers' terms.

■ The defendants next contend that, assuming the existence of the brokerage agreement, the alleged offer to sell could have been accepted only by the alleged buyer's board of directors and that there was no such acceptance on or before March 3, 1950. The defendants, therefore, conclude that the alleged buyer was not an able buyer on March 3, 1950. Blue Moon Foods, Inc. and June Dairy Products Co., however, would constitute an able, ready, and willing buyer without a formal meeting and vote of acceptance by the board of directors if certain officers and directors of the corporations had apparent or ostensible authority to bind the corporations as an able, ready, and willing buyer. Boston Food Products Co. v. Wilson & Co., 1923, 245 Mass. 550, 139 N.E. 637; Lonergan v. Highland Trust Co., 1934, 287 Mass. 550, 192 N.E. 34; cf. Hurley v. Ornsteen, 1942, 311 Mass. 477, 42 N.E.2d 273. In Rintamaki v. Cunard S. S. Co., 1910, 205 Mass. 115, 117, 91 N.E. 220, 221, the court stated: " * * * the principal question relates to the matter of Blomquist's apparent authority as distinguished from his actual or express authority. The question whether one is acting within the apparent scope of his authority as agent for another is usually one of fact the answer to which depends on the inference to be drawn from a variety of circumstances relating to the conduct of the apparent agent, and the knowledge or means of knowledge of the alleged principal of what is claimed to have been done in his behalf. If the circumstances are such by reason of the acquiescence or negligence of the alleged principal, or by reason of the nature of the duties intrusted to the supposed agent, and the situation in which the alleged principal has put him, as to warrant third parties in the exercise of a reasonable prudence and discretion in dealing with him as having authority to represent the alleged principal in regard to the transaction in question, then such principal will be bound; otherwise not." See also Ross v. Colonial Provision Co., 1937, 299 Mass. 39, 12 N.E.2d 98; Schleifer v. Worcester North Sav. Institution, 1941, 310 Mass. 110, 37 N.E.2d 255.

Louis Bandler, a director and treasurer of Blue Moon Foods, Inc. and June Dairy Products Co., stated in his deposition that Jason Whitney, M. S. Bandler, N. W. Bandler, L. C. Bandler, Murray Weil, and perhaps Norman Mesirol and one McCarren were directors of the corporations on or about March 3, 1950 and that Jason Whitney, N. W. Bandler, Murray Weil and Louis Bandler were the members of the executive committee of Blue Moon Foods, Inc. on or about that date. Nathan Bandler, a director and president of the corporations, stated that the majority of the securities of Blue Moon Foods, Inc. were held by the Bandler family. Louis Bandler and Nathan Bandler were present at the meeting of March 3, 1950 as representatives of the alleged buyer.

Louis Bandler testified in his depositions as follows:

"Q. Do you know whether the executive committee has the power to act for the Board of Directors? A. Well, they can't act for the Board of Directors, but they represent the Board of Directors up to the point of making it official.

"Q. Will you describe precisely what you mean by that? A. Well, the executive committee entertains all offerings of businesses and things of that sort, develops it, and does everything but the last procedure.

"Q. The executive committee is not empowered to consummate any deals? Is that what you are trying to say? A. The executive committee is always backed up by the board because the executive committee is the majority of the board.

\*    \*    \*    \*    \*    \*

"Q. You also stated that normally and generally, the Board of Directors will approve the action of the executive committee? A. Yes, sir.

\*    \*    \*    \*    \*    \*

"A. \*  \*  \* The executive committee sizes up whatever is before it. They go into it, develop it, and when it is ripe, at the board meeting they may even proceed to do all but close unofficially.

\*    \*    \*    \*    \*    \*

"Q. You wouldn't call that meeting a meeting of your executive committee, would you? A. I would.

\*    \*    \*    \*    \*    \*

"Q. On March 3, 1950, you and your brother, N. W. Bandler, were acting for the executive committee in exploring the Beacon proposition? A. With their knowledge.

"Q. With whose knowledge? A. Whitney's knowledge and Murray's knowledge.

"Q. You had communicated that orally? A. We had discussed the meetings we had with Gottlieb and Pariser, and Mr. Whitney put his stamp of approval on it right away because he was familiar with the company. Murray Weil said this would be the real thing for us.

\*    \*    \*    \*    \*    \*

"Q. As a matter of fact, you and your brother were not going to buy it then and there. It would have to go to the Board of Directors? A. We could more or less make a commitment there, knowing that we are really the Board of Directors. It is a very closely knit corporation. Whitney is my brother-in-law.

Murray Weil is my brother-in-law. Matty, Ned and I are directors.

\*    \*    \*."

We believe that this and other testimony in the record present a genuine issue of fact on whether or not Louis and Nathan Bandler had apparent or ostensible authority to bind Blue Moon Foods, Inc. and June Dairy Products Co. as an able, ready and willing purchaser at the meeting of March 3, 1950.

A final contention of the defendants is that the meeting of March 3, 1950 was purely exploratory, and therefore as a matter of law the plaintiffs are not entitled to a commission. See Elliott v. Kazajian, 1926, 255 Mass. 459, 152 N.E. 351.

In Casey v. Fritz Carlton Hotel Co., 1926, 254 Mass. 223, 228, 150 N.E. 162, 164, the court stated: "\*  \*  \* The contract governing the rights of the plaintiffs to a commission, as the jury might find it to be, does not turn upon the fact that a purchaser has been found and that every possible situation is agreed upon between the defendant and that purchaser which may arise before the conveyance becomes accomplished; but upon the question, Has a purchaser been produced who is ready, able, and willing to take the property upon the terms which the broker was authorized to offer to a customer as the basis of a final contract with the owner?"

Pariser stated in his deposition that George Isenman told him he wanted five million dollars for the business, with a deposit of one million dollars and the payment of the balance over a period of four years, and that Isenman said the earnings in 1949 had been one million dollars. Pariser also testified that he asked Isenman for a balance sheet and a profit and loss statement and Isenman replied, "Get the customers and we will give you the figures."

Louis Bandler testified in his deposition as follows:

"Q. And you wouldn't make a deal with them unless the certified

statement showed a million dollars of earnings after taxes? A. It showed what they said it was going to be.

\* \* \* \* \* \*

"A. They would not produce the statement.

\* \* \* \* \* \*

"Q. Do I understand correctly that one of the objects of the meeting on March 3, 1950, was to get from the Beacon Company a certified statement of their earnings? A. The object of that meeting was to buy the Beacon Company.

"Q. Were you prepared at that time to pay for the Beacon Company? A. We were prepared to pay for the company.

"Q. Irrespective of the earnings? A. If the earnings were substantiated.

"Q. In other words, the object of the meeting was to buy the Beacon Company if there were certified statements showing earnings of a million dollars after taxes? A. That's correct.

"Q. And when the company declined to give you that statement, you then thought of the deal as a dead duck? A. We couldn't get Mr. Isenman to give us the certified statement. \* \* \*"

■ This testimony clearly presents a genuine issue of fact on whether or not the negotiations were merely preliminary. Louis Bandler's insistence upon certified figures verifying the statements which Pariser testified Isenman made would not prevent Blue Moon Foods, Inc. and June Dairy Products Co. from being an able, ready, and willing buyer if such insistence "\* \* \* did not constitute a condition precedent to the existence of an agreement, but a reservation to be complied with before the agreement should be carried out, \* \* \*." Hutchinson v. Plant, 1914, 218 Mass. 148, 154, 105 N.E. 1017, 1020. Furthermore, the testimony quoted above tends to show that the negotiations were terminated at the meeting of March 3, 1950, because the defendants did not provide the alleged buyer with figures substantiating their statements to Pariser, even though they had promised to do so. It, therefore, "\* \* \* does not lie in the defendant's mouth to claim, in order to defeat the plaintiff's recovery, that other evidence was necessary to prove that the customer was ready, able and willing to purchase." Whitkin v. Markarian, 1921, 238 Mass. 334, 336, 337, 130 N.E. 684, 685; Seigel v. Cambridge-Wendell Realty Co., 1949, 323 Mass. 598, 83 N.E.2d 262.

The judgment of the district court is vacated and the case is remanded to that court for further proceedings not inconsistent with this opinion.