**VYE v. PARKER.**

No. 11957.

United States Court of Appeals,
Sixth Circuit.

June 16, 1954.

Bruce Parkhill, Chicago, Ill., Harry S. Manchester, Youngstown, Ohio, on brief, for appellant.

Ashley M. Van Duzer, Cleveland, Ohio, Thomas A. Quintrell, Cleveland, Ohio, Lewis L. Guarnieri, Warren, Ohio, on brief, for appellee.

Before ALLEN and McALLISTER, Circuit Judges, and FORD, District Judge.

ALLEN, Circuit Judge.

The sole question presented in this appeal from a judgment of the District Court dismissing an action for broker's commission is whether the case should have been submitted to the jury. The appellant had been instructed by appellee to sell the stock of The Standard Transformer Company, an Ohio corporation of which appellee was president and majority stockholder. Through his wife and daughter's holdings appellee had complete control of the stock. He desired to sell the business but wished to continue to control and operate the company and to maintain and protect his organization. Appellant suggested that Illinois Institute of Technology, an educational institution, might be interested and appellee authorized appellant to take up the matter with the Institute. Appellee set the price of the business at $2,500,-000 and made his retention of control as managing head of the business and protection of his organization a condition of the sale. This was specifically admitted by appellant. Appellee wanted a down payment of $500,000 but later this requirement was withdrawn. Also, he desired to carry out the transaction in such a way that corporation and person-

al taxes should be minimized. Appellant suggested that if the property was sold to a non-profit organization such as the Institute the income of the company might be held tax exempt. But agreement was never reached as to the correctness of this proposition, concerning which appellee's advisors were extremely doubtful. The Institute itself said that it could not consider any deal based upon tax exemption of the operating company. However, it declared it was interested in acquiring appellee's business and wished to retain him and his organization. Several negotiations along these lines were held between appellee and representatives of the Institute. At a meeting in Chicago February 21, 1950, after a conference with the president and assistant secretary and treasurer of the Institute (R. J. Spaeth), appellee and appellant met with Louis S. Hardin, counsel for and a trustee of the Institute, who had specialized in federal taxes. Hardin assured appellee that the Institute would endeavor to obtain exemption from income taxes for the operating company, and suggested that the Institute form an independent foundation to make the purchase and organize a Delaware corporation to operate the business. Hardin explained the Institute's view of the advantages of organizing the new foundation and of having the Delaware corporation carry out the purchase, said that the Institute did not wish to furnish management and would give appellee a management contract which Hardin agreed to prepare. He stated that the Institute was not concerned about term or salary and that appellee might have anything within reason he wanted. Appellee did not know what term or salary

he wanted. On the matter of control of the board of directors of the operating company Hardin suggested that appellee name a minority of the board and choose the majority from the 60 trustees of the Institute. Appellee at the close of this meeting said he was generally satisfied and agreed that Hardin should prepare the necessary papers to reduce "the oral agreement to writing."

The draft contracts prepared and forwarded to appellee included a management contract with appellee, a contract of sale of The Standard Transformer Company, and an indenture. The amount of down payment of the business was left blank in the contract of sale, which ran to the technology foundation instead of to the Institute. The term and the amount of salary were left blank in the employment contract. When the papers were presented to appellee's attorneys, they advised him that the proposed contracts did not protect him and he refused to go on with the deal. Appellant claims that the conversation of February 21, 1950, of appellee with Hardin, in which appellee stated that he was generally satisfied and agreed that papers should be prepared to reduce the oral agreement to writing, taken together with the preliminary negotiations, constitute evidence of a completed contract under which appellant secured for appellee a purchaser ready, willing and able to buy, thus entitling him to a commission. Hence he contends that the District Court was required to submit the case to the jury.

The District Court in a memorandum, part of which is appended in the margin,[1] held that appellant did not pro-

[1] "The defendant Parker was desirous of relieving himself of the incidence of potential taxation implicit in his corporate situation, as well as his individual tax status. He engaged the plaintiff to sell his stock at a fixed price, on a long-time installment basis, under a contract that would leave him in control and protect his key employees. He obligated himself to pay the plaintiff a commission of three per cent upon the consummation of an agreement which accomplished the ob-

jectives sought and still protected him in his control of his company and the assurance of retention of his loyal employees.

"Did the plaintiff produce such a purchaser and was a contract consummated, incorporating the basic requirements which formed the consideration for the brokerage contract?

"The fact is, as I appraise the evidence, not in material dispute, that the purchaser produced by the plaintiff trans-

duce a purchaser willing and able to buy upon the terms laid down by appellee and dismissed the complaint. We think the judgment must be affirmed.

Appellant's contention that this case was required to go to the jury is based upon loose statements by appellee, such as that he was generally satisfied and that a deal to sell the stock had been secured by appellant. But appellant's obligation was not satisfied unless he did more than generally to satisfy the appellee. If on the undisputed facts no contract was secured conforming to the terms laid down by appellee and never withdrawn and if no purchaser was secured ready, able and willing to buy, the judge was required to take the case from the jury.

■ Appellee's principal terms which were a condition of the sale and were never changed were: (1) that the price should be $2,500,000; (2) that the operation should be subject to his complete control through a long-term employment contract in which he should direct the operation and the protection of his organization. In the contract submitted by Hardin appellee's term of employment and the amount of his salary were not fixed; his office was not defined. Hardin stated that appellee could have anything "within reason;" but this is not a legally enforceable contract term. What is within reason to one person may be totally unreasonable to another and this statement had no legal force and effect. As to control, this was proposed to be obtained by appellee's choosing a minority of the directors and choosing the remaining majority from the Institute's own directors. In view of these undisputed facts the District Court correctly found that Hardin's propositions on behalf of the Institute constituted a counteroffer differing so substantially from appellee's proposal that it could not be considered an acceptance. Cf. Rowe v. Shilby, 86 U.S.App.D.C. 74, 179 F.2d 807, 18 A.L.R.2d 373.

formed the defendant's objectives into proposals which were more in the interest of the purchaser, and, while providing for payment of the defendant's price over a long period, left him without control of the company, or even reasonable security for his property, himself, or his employees.

"What it seems to me happened was a reversal of the original purpose or objectives of the defendant, which resulted in the plaintiff furnishing a purchaser that proposed terms designed to insure its future, without responsibility, and put the defendant to the task of accepting or rejecting what might appropriately be called counter proposals.

\* \* \* \* \* \*

"While it is true that the defendant at Chicago, on February 20th or 21st, 1950, did tell Hardin, a trustee and general counsel for the Illinois Institute in charge of the negotiations, that the proposals put forward by him, Hardin, were 'generally satisfactory,' there was left open the final decision when the drafts should be prepared and presented.

"It is my considered judgment from this evidence that the draft presented did not embody those basic requirements that the defendant had consistently stated were essential to the sale of his stock.

"I find no issue of fact of a substantial character which would control decision.

What I decide is that there was no meeting of the minds, considering the evidence not materially at variance and in the light most favorable to the plaintiff's case. The parties, as I see it, were still negotiating on May 17, 1950. What the trustees of the Institute did on April 21, 1950 was to accept the proposals drafted by one of its members, who was also general counsel, which assumed no responsibility or commitment, but assured the Institute of control and ultimate possession of the defendant's property without investment of anything. That was a contract satisfactory to the trustees of the Institute, but it hardly could be said to embody the essential protective covenants that the defendant engaged the plaintiff to secure for him in the sale of his stock.

\* \* \* \* \* \*

"To consolidate and summarize my conclusions in the foregoing premise, I do not think the contract as drafted and presented to Parker incorporated or made provision for several of the requirements specified by him, the minds of the purchaser and the seller had not met as to several of the essential provisions, and certainly in such circumstances the agreement can not be said to have been consummated.

"The drafted papers did not represent or exemplify an acceptance of the terms and requirements of Parker's offer to sell."

■ Moreover, appellant did not produce a purchaser able to buy. On February 21, 1950, and during all the period involved, the contemplated foundation proposed by the Institute was not in existence. It was proposed that this foundation should own the shares of a Delaware corporation to be newly formed, which was to acquire the assets of The Standard Transformer Company and operate its business. Whatever assets the non-existent foundation might have in the future would be derived from appellee's company. Appellee was to be paid with a note issued by the Delaware corporation. The Institute, a solvent corporation, refused to buy the stock and a new corporation was to assume the obligation. Thus the party with whom appellee was dealing was eliminated and a new party was substituted, certainly not able to buy. Since it was not yet in existence it could hardly be said to be ready and willing.

In the original negotiations appellee specifically stated that any proposition was to be subject to the approval of his attorneys. This condition was never modified, as appellant conceded, and it was recognized by the Institute. The Institute's president wrote appellee that they would be interested in hearing "about the report from your group," and on April 21, 1950, appellant wrote appellee that the school should "come up with some concrete proposal in black and white so that your own attorneys could weigh all the angles." The attorneys specifically rejected the contracts submitted.

■ The Institute itself did not consider that the contracts submitted to appellee in accordance with the negotiations of February 21 were binding contracts. The minutes of the Institute for June 12, 1950, described the matter as being in the stage of negotiation. Appellant and Spaeth both treated it as an open transaction. In his letter of July 18, 1950, after the contracts were rejected, Spaeth expressed his regret upon the ground that the Institute had been proceding "along the line you wanted" and in his letter of August 7, 1950, he said, "We are quite disappointed that we will not be able to proceed with our negotiations." In his letter of July 18th to appellee Spaeth said, "Certainly you have every right to change your minds prior to making a final decision. * * * " The agreements, if any, were only tentative. They do not constitute a contract. Restatement of the Law of Contracts, Section 26, Comment a. Cf. 1 Williston, Contracts (Rev.Ed.) 54, § 27. So long as they were in negotiation the seller could withdraw. Hale v. Kumler, 6 Cir., 85 F. 161. Both parties expected contracts to be drawn which would cover the important matters upon which no agreement had been reached. In its submitted form the employment contract was lacking in the most material terms and was not enforceable and did not constitute a basis for recovery of real estate commission under Ohio law. Pfanz v. Humburg, 82 Ohio St. 1, 91 N.E. 863, 29 L.R.A.,N.S. 533; Patton v. Alessi, 42 Ohio App. 91, 180 N.E. 387; Cline, Inc., v. Union Thread Co., 73 Ohio App. 393, 56 N.E.2d 517. Since the contract of sale failed to meet the conditions of appellee's offer and since appellant did not secure a buyer ready, willing and able, appellee was entitled to terminate the brokerage contract. Cf. Brenner v. Spiegle, 116 Ohio St. 631, 636, 639, 157 N.E. 491; Restatement of Agency, Section 453, Comment b.

The judgment of the District Court is affirmed.