Jack A. RAINIER, Appellant in No. 13337,

v.

CHAMPION CONTAINER COMPANY, Irwin R. Weiner, Appellant in No. 13338, Ira Earl Robinson and Harry A. Robinson.

Nos. 13337, 13338.

United States Court of Appeals Third Circuit.

Argued Jan. 10, 1961.

Decided July 21, 1961.

Robert L. Trescher, Philadelphia, Pa.
(Mercer D. Tate, Montgomery, McCrack-

en, Walker & Rhoads, Philadelphia, Pa., on the brief), for plaintiff-appellant.

Abraham L. Freedman, Philadelphia, Pa. (Franklin Poul, Seymour Kurland, Sylvan M. Cohen, Norman C. Henss, Wolf, Block, Schorr & Solis-Cohen, Cohen, Shapiro & Cohen, Philadelphia, Pa., on the brief), for defendant-appellant.

Before GOODRICH, McLAUGHLIN and FORMAN, Circuit Judges.

FORMAN, Circuit Judge.

These are cross appeals from a judgment of the United States District Court for the Eastern District of Pennsylvania. Jurisdiction is based on diversity of citizenship.

The suit was brought by Jack A. Rainier against the now dissolved Champion Container Company (Champion) and three of its former shareholders, Irwin R. Weiner, Ira Earl Robinson and Harry A. Robinson.

In the first count of his complaint in the District Court Rainier alleged that defendants entered into a brokerage contract with him in which they agreed to pay him a commission of five percent of the purchase price if he found a buyer for the capital stock of Champion. Rainier further alleged that he found a buyer who was ready, willing and able to buy the capital stock of Champion for $1,000,000 and defendants agreed to sell for that price but that defendants failed to pay the agreed commission. He therefore demanded judgment of $50,000 plus interest and costs on this count.

In the second count Rainier alleged that he entered into a second contract with the defendants in which they agreed to pay him a commission of five percent of the purchase price if plaintiff found a buyer for the assets of Champion, exclusive of real estate. He further alleged that he found such a buyer who was ready, willing and able to pay $1,000,000 and that defendants agreed to sell for that price but that they refused to pay the commission. Rainier therefore demanded judgment on the second count for $50,000 or a total of $100,000 plus interest and costs on both counts.

After trial, the District Court filed an opinion in which it made findings of fact and conclusions of law.[1] It entered judg-

1. They are as follows:

"The Court has jurisdiction over the parties and the subject matter of this suit.

"*With regard to the first deal*—

"1. Weiner told Rainier that the owners of the Champion Container Company would pay him a five percent commission if he found a buyer for the company at a price of around a million dollars.

"2. This was an offer of a unilateral contract.

"3. Although Weiner purported to make this offer on behalf of himself and the other shareowners of the Champion Container Company, Weiner had no authority to bind the other shareowners to any brokerage contract with Rainier.

"4. The terms of the offer were that the commission would be paid if plaintiff produced a buyer ready, willing and able to perform an agreement of sale for the Champion Container Company, if such agreement were concluded between plaintiff's buyer and Weiner.

"5. Plaintiff did produce such a buyer, one Floyd Gottwald, who offered to purchase all of the stock of the Champion Container Company for one million dol-

lars in Class B stock of the Albermarle Paper Company valued at $25 per share.

"6. This offer was communicated to Weiner by Rainier in New York in the spring of 1956.

"7. Weiner, purporting to act for himself, and the other shareholders of the Champion Container Company, accepted Gottwald's offer.

"8. This acceptance resulted in a definitive oral agreement of sale between Weiner and plaintiff's buyer, which agreement bound Weiner but did not bind the other shareholders of the Champion Container Company.

"9. Floyd Gottwald was, at all times material hereto, ready, willing and able to carry out this agreement of sale.

"10. When plaintiff produced his buyer, Floyd Gottwald, in New York in 1956 and his buyer and Weiner reached the described agreement of sale, plaintiff had completed his performance of the brokerage contract.

"11. Plaintiff's acceptance of Weiner's offer of a unilateral brokerage contract occurred simultaneously with plaintiff's performance of said contract.

"12. The described agreement of sale,

ment for $50,000 for Rainier against Weiner on the first count of the complaint, but dismissed the action against the other defendants. It also dismissed the action alleged in the second count of the complaint.

In No. 13,337 Rainier appeals from the judgment below in so far as the District Court dismissed his action against defendants, Champion, Ira Earl Robinson and Harry A. Robinson, as stated in the first count of his complaint. He also appeals from the dismissal of the action alleged in the second count of his complaint.

In No. 13,338 Irwin R. Weiner appeals from the $50,000 judgment against him.

Rainier, a resident of New York, was a business broker with offices there. All of the individual defendants were residents of Philadelphia. The defendant Champion was incorporated in Pennsylvania. At the time in question, 1956, all the individual defendants were directors of Champion and Irwin R. Weiner was its President; Ira Earl Robinson, its Secretary-Treasurer and Harry A. Robinson, Chairman of the Board. Irwin R. Weiner and Harry A. Robinson each owned one-third of the stock and Ira Earl Robinson, his mother and sister together, owned the remaining one-third.

Early in 1956, Weiner telephoned Rainier, with whom he was previously acquainted and requested that the latter come to Philadelphia to "talk with him and to see a machine." Rainier went to Philadelphia, observed the operations of Champion in detail[2] and was told by Weiner that he would be paid a commission of five percent if he could find a buyer for the business at "somewhere around $1,000,000." On February 22, 1956, Rainier brought Floyd D. Gottwald to Philadelphia where they both observed the operations of Champion under the guidance of Weiner. Gottwald was president, director and owner of a majority of the voting stock of Albermarle Paper Manufacturing Company of Richmond, Virginia (Albermarle). Shortly thereafter Gottwald received a statement of the financial position of Champion. He also sent Albermarle's vice president in charge of sales to Philadelphia to make a favorable report to Gottwald in so far as the sales aspect of Champion was concerned.

Subsequently, in late February or early March, 1956, Weiner, Gottwald and Rainier met in the latter's office in New York. At that meeting a general discussion concerning the proposed sale of Champion took place. However, before a definitive agreement could be reached Gottwald found it necessary to depart, but he testified that before leaving he authorized Rainier to conduct further negotiations and to reach an agreement on the basis of his previous understanding with Rainier. Rainier's testimony as to what transpired after Gottwald departed was as follows:

"A. It took us about ten minutes and I said to Weiner, 'I understand you want about $1,000,000.'

"Oh, I said, 'What do you want?'

"He said, '$1,000,000.'

"I said, All right.'

or the first deal, did not result in an actual sale of the Champion Container Company's stock to the Albermarle Paper Company through no fault of plaintiff's buyer, but because the owners of the Champion Container Company refused to go through with the deal.

"13. Plaintiff thereupon became entitled to receive from Weiner his commission in the amount of $50,000.

"*With regard to the second deal*—

"1. The brokerage contract required again that plaintiff produce a buyer ready, willing and able to purchase the assets (excluding real estate) of the Champion Container Company and that such buyer enter into an agreement of sale with the authorized agent of the Champion Container Company.

"2. No such agreement of sale was ever reached between the said parties.

"3. Therefore, plaintiff did not earn a commission on the second deal."

2. Champion, at the time, was in the course of developing a novel paper drinking cup making machine which Weiner exhibited to Rainier in a warehouse in Philadelphia separate from the main plant, under conditions said to be secret.

"The stock of Albermarle Paper Company had been selling at seventeen when we started this about a month or two previously and it was then selling at thirty, and I said, 'We will give you $1,000,000 in stock of the Albermarle Paper Manufacturing Company.'

"He said, 'At what price?'

"I said, 'Well, I think it is a fair price under the conditions, that is a rapid rise. It would be $25 a share.'

"And he said, 'All right, that's fine,' and we shook hands."

Rainier further testified that he advised Gottwald of the foregoing and that Gottwald indicated his approval. Gottwald also testified that he requested that Albermarle's treasurer and accountants be permitted to check the financial statement in Philadelphia but such permission was not granted.

Rainier asserts that further dealing between the parties became impossible shortly thereafter due to Weiner's arbitrary refusal to see or receive calls from him, and the sale agreed upon was never consummated.

In July 1956, as a result of a telephone conversation between Rainier and Ira

Earl Robinson, negotiations were resumed. However, at this time Robinson informed Rainier that the selling price was $1,250,000.[3] Rainier again went to Philadelphia and toured the Champion plant with Weiner. Subsequently Rainier met in Philadelphia with Weiner and Henry Robinson,[4] and a further discussion concerning the proposed sale of Champion ensued. At this conference Rainier demanded a written authorization to continue negotiations for the sale of Champion. He received such a letter from Weiner dated August 28, 1956.[5]

On or about September 7, 1956, Rainier and Gottwald again toured the Champion plant accompanied by Weiner. At that time representations were made by Weiner that Champion would sell all its assets, exclusive of real estate for $1,000,000. Gottwald testified that Albermarle agreed to pay as the price $1,000,000 in its Class B (non-voting) stock. Shortly after the last Philadelphia meeting Weiner visited Gottwald in Richmond, Virginia where further discussions took place. However, they were cut short because Gottwald was leaving for Europe.

Negotiations were never resumed and eventually Champion was sold to another purchaser for $1,500,000.

3. Prior to this time Champion had sold its liquid container machinery.

4. Henry Robinson was the brother of Harry A. Robinson and father of Ira Earl Robinson.

5. The letter was as follows:
"Irwin R. Weiner
"August 28, 1956
"Dear Mr. Rainer: [sic]
"I have talked with my associates, owners of the outstanding Capital Stock of Champion Container Company to begin negotiations for the sale of its real estate and real estate improvements situated at 980 No. Delaware Avenue, Philadelphia 23, Pennsylvania, together with the production machinery for the manufacture of paper cups, their being our pilot model machine and five cup forming machines, along with complete integrated waxing equipment and printing equipment. There is also machine shop equipment, air compressors, baling equipment and miscellaneous items. Complete sets of engineering blue prints, commencing with the original plans dating back to 1949, and including the plans for the cup forming machines which have just been completed.

"I am authorized to offer you the real estate and equipment for the aggregate purchase price of $1,250,000, payment subject to terms mutually agreed upon. It would be helpful to have your principals, Albermarle Paper Co., inspect the cup forming machines in operation.

"This letter is intended merely to indicate to you that we are prepared to begin negotiations, looking toward a possible sale. As you understand, consideration will have to be given to numerous matters before there could be a meeting of the minds, but I trust with this letter you will feel warranted in attending a meeting or otherwise engaging in conversations looking toward a satisfactory contract.

"With every good wish, I am,
"Sincerely yours,
"Irwin R. Weiner
"Irwin R. Weiner"

The contract for commission alleged here is a unilateral one, consummated in New York City. Restatement, Agency 2d, § 445, comment c, (1958). Woolley v. Bishop, 10 Cir., 1950, 180 F.2d 188. The validity of the contract is governed by the law of the State of New York. Restatement, Conflict of Laws, § 323 (1934), Woolley v. Bishop, supra. There appears to be no dispute that New York law governs.

Weiner submits that the District Court erred in finding a definitive contract of sale on what has been called by the District Court the "first deal". Weiner argues that:

> " * * * no binding agreement could be reached before the minds of the parties had met on such fundamental problems as the warranties to be made by Champion's shareholders as to the finances of Champion, the handling of subsequently discovered claims or tax liabilities, the date of closing and the risk of changes in the situation prior thereto, appropriate limitations on the rights of Champion's stockholders during the period preceding closing, agreements for the employment of personnel, and protection for Albermarle against disclosures that would lessen the value of the secret machinery. * * "

He notes that Gottwald never "waived his expressed need to make certain that Albermarle got all it was paying for." Weiner further contends that the parties never reached an agreement on the retention of certain employees.

It is true that no date was set for closing but a reasonable time could be implied.

There was some discussion of the possible retention of Weiner and his brother as employees. However, no definitive agreement was reached on this point. But this signifies nothing more than that Weiner and his brother were not bound to work for Albermarle, nor was Albermarle bound to employ them. The failure to reach agreement on this issue does not mean that the parties did not intend otherwise to enter into a binding agreement.

The other matters noted by Weiner were never discussed. Weiner and Gottwald could have discussed and agreed on these matters but they simply did not. That failure, however, did not prevent them from entering into a binding agreement for the sale of Champion stock. They were not essential to the formation of a contract. Nor did the fact that Gottwald never waived his desire to verify Champion's balance sheet prevent the formation of a binding contract. It did not constitute a condition precedent to the existence of the agreement but rather a reservation to be complied with before the agreement should be carried out. Gottlieb v. Isenman, 1 Cir., 1954, 215 F.2d 184.

Weiner cites three cases to support his position. None of them, however, is in point. In the first, Stern v. Bristol Corp., 273 App.Div. 371, 77 N.Y.S.2d 324, affirmed 1948, 298 N.Y. 766, 83 N.E.2d 463, plaintiff was employed by the stockholders of a going hotel business to sell their stock. He testified that he had produced a purchaser who had offered $580,000 for the business which the defendant had accepted. The court dismissed the complaint on the ground that plaintiff failed to prove an agreement on all the terms essential to the contract. It said:

> "One term essential to any such agreement to transfer a going hotel business through the transfer of all its stock is the date on which the financial status of the corporation is fixed by the parties for the purpose of such transfer. Without a definitive agreement on such date, plaintiff's syndicate could have no idea what assets they were getting and what liabilities, fixed and contingent, they were assuming; nor could defendants know what they were giving or getting in the transaction. The evidence fails to show even a claimed agreement on this indispensable term of the special type of contract alleged and relied on, or indeed on other terms important

in such a transaction." 77 N.Y.S.2d at page 328.

It is obvious that the instant case is readily distinguishable. Here Weiner had provided Gottwald with a balance sheet which set forth the assets and liabilities of Champion as of January 31, 1956. Gottwald had visited Champion's plant as did Albermarle's sales manager. Weiner knew what he was selling and Gottwald knew what he was buying.

In the second case, Vye v. Parker, 6 Cir., 1954, 214 F.2d 73, plaintiff had been instructed to sell the stock of a corporation of which defendant was president and majority stockholder. One of the terms of the brokerage contract which was a condition of the sale required that defendant obtained a long-term employment contract in which he would direct the operation of the business. In the contract submitted to defendant the term of his employment and the amount of his salary were not fixed. Defendant was told he could have anything within reason. Defendant's continued control of the business was not protected. Under these facts the Court of Appeals held that the broker had failed to meet the terms of defendant's offer and therefore he had not earned a commission. In citing this case Weiner notes: "There, as here, defendant's continued employment with the company was a key term of the sale." The facts do not bear him out. Nowhere does the record disclose that Weiner's continued employment was a "key term of the sale".

In Jackson v. Goes, 7 Cir., 1950, 181 F.2d 849, the prospective buyer told defendants he was not averse to paying $1,200,000 for the assets of the business. However, the prospective buyer refused to make an earnest payment or sign an agreement but stated that:

" * * * as he was about to leave for Mexico and desired that his lawyer, his auditor, and his engineer make further investigations during his absence, he wanted it understood that he was *not binding himself* to purchase the property and that Vilter [the corporation involved] was not bound to sell it to him." (Emphasis supplied.) 181 F.2d 849.

Soon thereafter the business was sold to another buyer. This case is also readily distinguishable. In the case at bar there was no such reservation.

■ Weiner next argues that the alleged contract of sale was never agreed to by Albermarle since the latter's board of directors never approved it. He therefore concludes that if Albermarle was never bound neither was he. There are a number of reasons why this contention cannot prevail. At the time of these negotiations Gottwald owned over fifty percent of the voting stock of Albermarle, was on the board of directors, and president of the company. He had kept the board continuously advised of his progress in the negotiations for the purchase of Champion. And he had also received informal authorization from the board to offer up to $1,250,000 for Champion. Weiner never raised the issue of whether Albermarle's board of directors would approve the sale until Rainier brought suit. It was entirely an afterthought. As was said in Rode & Brand v. Kamm Games, 2 Cir., 1950, 181 F.2d 584, 587:

" * * * 'Where a party gives a reason for his conduct and decision touching anything involved in the controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law.' Ohio & Mississippi Ry. Co. v. McCarthy, 96 U.S. 258, 267, 268, 24 L.Ed. 693. And our court has held, in Vernon Lumber Corp. v. Harcen Const. Co., 2 Cir., 155 F.2d 348, 351, that a party to a contract may not repudiate the contract on one ground and later assert entirely different grounds as a defense for such refusal to perform. It is of course familiar tactics for buyers, caught by a drop in the cost of goods or failure to sell them as planned, to seek some *a posteriori*

justification for nonacceptance—compare Comment, Remedies for Total Breach of Contract under the Uniform Revised Sales Act, 57 Yale L.J. 1360, 1363—but the law does not look with favor on this method of avoiding the consequences of unfortunate business ventures."

To the same effect see Schanerman v. Everett and Carbin, Inc., 1952, 10 N.J. 215, 89 A.2d 689, and cases cited therein.

■ Also, it is well settled that where one party to a contract is himself the cause of a failure of performance by the other party, he cannot advantageously utilize his own fault as an exit of escape from the performance of his contractual obligations. Amies v. Wesnofske, 255 N.Y. 156, 174 N.E. 436, 73 A.L.R. 918 (Ct.App.1931); Miles v. Metzger, 316 Pa. 211, 173 A. 285 (1934); Restatement, Contracts § 295 (1931).

■ In the instant case the wrongful refusal of Weiner to permit the verification of the balance sheet was the obstruction which prevented Gottwald from obtaining approval of the Albermarle directors. Weiner may not be heard to complain of that failure under the circumstances.

■ Weiner finally urges that there was no evidence that he *purported* to bind the other shareholders without authority, and so became personally liable under the contract for commission. The District Court found Weiner liable to Rainier on the theory of a breach of warranty of authority. Restatement, Agency 2d, § 329 (1958). Weiner's conduct throughout the entire negotiations was a representation that he had complete authority to act for the other shareholders. Rainier testified that Weiner "told me he spoke for all of the stockholders." Indeed Weiner was the only shareholder who conducted the negotiations. In the course of them on what has been called the "second deal" he visited Richmond, Virginia and investigated the worth of Albermarle's Class B stock.

The judgment of the District Court in favor of Jack A. Rainier and against Irwin R. Weiner for $50,000 on the first count of the complaint (Weiner's Appeal No. 13,338) will be affirmed.

In Appeal No. 13,337, Rainier contends that the District Court committed error when it found that "[a]lthough Weiner purported to make this offer on behalf of himself and other shareowners of the Champion Container Company, Weiner had no authority to bind the other shareowners to any brokerage contract with Rainier." In other words it is Rainier's contention that Weiner had actual or apparent authority to bind the other shareholders.

■ In its opinion the District Court said:

"Weiner, in his position as President of the corporation, would have the authority to bind the corporation only in ordinary business transactions. The transactions involved in this suit certainly do not fall within that category. Of course, Weiner's position as President of the corporation would give him no authority to represent the other shareholders in any business transactions regarding their stock.

"We have made a painstaking study of the testimony concerning Weiner's alleged authority. We have come to the conclusion that even if we held that Weiner bound the other shareholders (through his actual authority, apparent authority or by estoppel) when he entered into the brokerage agreement with Rainier, still there is no theory upon which we could hold that he bound them when he allegedly accepted the offer made by plaintiff's buyer to purchase their stock in the company for one million dollars in stock."

We, too, have reviewed the entire record and while the question is close we cannot say that the findings of the District Court are clearly erroneous. Where, as here, the findings of the District Court are dependent upon oral testimony and the candor and credibility of witnesses we should disturb them only in the most

unusual circumstances. Rosenthal v. Hildebrand, 7 Cir., 1957, 242 F.2d 607.

 Rainier also urges that the District Court erred in its findings with regard to the "second deal". In this regard the court found:

*"With regard to the second deal—*

"1. The brokerage contract required again that plaintiff produce a buyer ready, willing and able to purchase the assets (excluding real estate) of the Champion Container Company, and that such buyer enter into an agreement of sale with the authorized agent of the Champion Container Company.

"2. No such agreement of sale was ever reached between the said parties.

"3. Therefore, plaintiff did not earn a commission on the second deal."

Rainier apparently contends that he earned his commission when he presented to defendant "a purchaser ready, willing and able to purchase the property upon the terms stated to the broker by the seller." He, however, conceded that he expected to earn a commission only if an agreement of sale was reached. Gottwald testified that no agreement on the "second deal" was ever concluded. The evidence in the case shows without question that there was no acceptance of Gottwald's second offer. Following a visit by Weiner to Gottwald in Richmond, Virginia, in September 1956, for investigation of the Class B stock of Albermarle and further discussion negotiations were left in abeyance pending the return of Gottwald from a European trip. They were never resumed.

The findings and conclusions of the District Court on the "second deal" are correct. Its judgment on the second count of the complaint against Jack A. Rainier and in favor of Champion Container Company, Irwin R. Weiner, Ira Earl Robinson and Harry A. Robinson (Rainier's Appeal No. 13,337) likewise will be affirmed.