Application of **BABY WORLD COMPANY, Inc.** and **West Virginia Plastics, Inc., Debtor,**

For relief under **Chapter XI, Section 322** of the **Bankruptcy Act.**

No. 63 B 454.

United States District Court
E. D. New York.

May 12, 1964.

**284**

Samuel B. Brouner, New York City (Murray H. Paloger, New York City, of counsel), for petitioner on review.

Elias Mann, New York City (Herman A. Bursky, and Levin & Weintraub, New York City, of counsel), for debtor, respondent on review.

DOOLING, District Judge.

Alan Daniels, the petitioner on review, owned half the stock of the Debtor in 1961 and he then contracted to sell it to the Debtor for $250,000. $150,000 of the price was payable in thirty-five equal monthly installments commencing August 2, 1962. Under the sales contract, if the Debtor defaulted, Daniels could choose either (a) to get back his stock and regain control of the Debtor, retaining half the money he had received for it and returning the rest of the money to the Debtor, or (b) he could choose to keep all the money received but give up the stock and any further claim for purchase price. The question presented is this: when the Debtor defaulted the note payable April 2, 1963, and then on April 30, 1963, embraced the benefits of Chapter XI of the Bankruptcy Act, was Daniels' first contractual alternative—getting back his stock and regaining corporate control of the Debtor—rendered so valueless, or placed so far beyond worthwhile performance, that the Debtor could not insist that Daniels choose between the contractual alternatives but was rather required to suffer Daniels to retain both the stock and all the money paid on account for it? The learned Referee held that the Debtor could insist on Daniels' choosing and that, since he had not chosen to regain the stock and corporate control and return half the money, he must surrender the remaining unpaid non-negotiable payment notes to the Debtor and release the stock from escrow to the Debtor. The decision of the Referee gives their intended effect to the provisions of the highly sophisticated contract and the decision must be confirmed.

The agreement provided for a sale by Daniels for $250,000 of his entire one-half interest in the Debtor and its subsidiaries and affiliates, that interest being represented by 10 shares of stock. $20,000 was to be paid at the closing on December 26, 1961, $80,000 was to be paid eight days later, on January 3, 1962,

and the balance of $150,000 was payable (with interest of 4½%) in 35 equal monthly instalments starting August 2, 1962. A debt of $20,000 to Daniels was to be paid in 5 equal monthly instalments commencing March 2, 1962, and ending July 2, 1962. All payments were made until April 2, 1963, when the Debtor failed to pay the ninth monthly instalment then falling due. By April 2, 1963, the Debtor had paid $134,285.60 on account of the stock purchase and had paid off the $20,000 debt. Possibly it had also transferred to Daniels an equity in certain insurance on Daniels' life.

The agreement (paragraph "5") provided that if the Debtor defaulted a monthly note and failed to cure the default within 10 days, Daniels had

"* * * the right to cancel this agreement with the effect that he will thereafter be restored to the same position he had prior to the execution of this agreement, provided, however, that within one hundred (100) days after such default Daniels gives notice to [Debtor] of his intention to cancel this agreement, and further provided that within one hundred thirty (130) calendar days after such default he returns to [Debtor] one-half (½) of so much of the purchase price (not including the interest theretofore paid) represented by the payments made to the date of default * * *; failing which [Debtor] shall be free from any and all further obligations to pay the balance then due on the purchase price and all the notes then outstanding shall be deemed cancelled. Daniels agrees to return and surrender said notes to [Debtor]. After such a default, Daniels may either by himself or by such agents as are designated by him, immediately inspect the books and records and take a physical inventory of merchandise and equipment of [Debtor] and its subsidiaries, and [Debtor] agrees to make available such information as is necessary or proper for such inspection at its premises and during the normal business hours of [Debtor] and its subsidiaries. The within remedy shall be the sole remedy available to Daniels in the event of default by [Debtor]."

The stock, under the agreement, was held by an escrow agent and, while so held, was to be deemed and treated as "Treasury stock" of the Debtor. The agreement provided further:

"In the event of a default, and if Daniels exercises his right pursuant to Paragraph '5' hereof, then, upon his return to [Debtor] of the sum therein called for, the said stock will be delivered to him, and simultaneously therewith a Special Meeting of the stockholders will be held, and Daniels and a nominee of Daniels will be caused to be elected as directors and Daniels as an officer of the Corporation. In the event Daniels does not make such refund pursuant to Paragraph '5', the moneys received by Daniels to the date of such default shall be deemed the full purchase price and the remaining notes thereafter due are cancelled, and thereupon the escrowee will deliver the said certificate of stock to [Debtor]."

Under the agreement Daniels resigned as an officer and director of the Debtor; it was provided that if the agreement was "cancelled," all employment agreements of Debtor's officers were to be cancelled. Until the shares were delivered out of escrow, the Debtor had to supply Daniels with annual certified financial statements and unaudited semi-annual trial balances. Daniels gave, as part of the agreement, a broad covenant not to compete in the field for five years.

Daniels' argument, in essence, is that invoking the Bankruptcy Act was such a breach of the agreement (Central Trust Co. of Ill. v. Chicago Auditorium Assn., 1916, 240 U.S. 581, 590–592, 36 S.Ct. 412, 60 L.Ed. 811) as altogether put an end to it and that it was a breach different from and not identical with the one breach (default in paying an instalment note) that gave rise to the alternative

remedies of Paragraph 5. The unprovided for breach, Daniels argues, excused any performance on his part (such as giving notice of cancellation and returning half the consideration received) both because invoking Chapter XI was a breach and because the Debtor, insolvent and voluntarily in the Bankruptcy Court and managed under judicial supervision, had made itself quite unable to "restore [Daniels] to the same position he had prior to the execution of this agreement" (Rainier v. Champion Container Co., 3rd Cir. 1961, 294 F.2d 96, 103). Daniels further argues that the provisions of 11 U.S.C. §§ 742, 743 extending the Court's control over the management of its affairs by a Debtor in Possession would render nugatory any formal restoration of Daniels to office and would not constitute the counter performance contemplated in the case of a cancellation and restoration to rights.

The Debtor contends that the agreement can be and therefore ought to be enforced as written and that, here, where a genuine breach occurred before bankruptcy, on April 2 through 12, 1963, the later proceedings in Bankruptcy Court did not discharge the contract or excuse compliance with its terms on Daniels' part (Cf. Tobin v. Plein, 2d Cir. 1962, 301 F.2d 378, 380–381; 11 U.S.C. § 110, sub. b). Further, the Debtor argues, the agreement was such that the Debtor's only possible breach was in the non-payment of money so that the alternative remedies of the agreement completely stated all the remedies of Daniels. That the Debtor is in the Court of Bankruptcy under Chapter XI, it is argued, does not make meaningless Daniels' elective right to regain the stock and his corporate control (In re O'Gara Coal Co., 7th Cir. 1919, 260 F. 742; 11 U.S.C. §§ 706(1), 723; Cf. In re J. P. Linahan, 2d Cir. 1940, 111 F.2d 590); Daniels' argument, it is said, assumes that under the agreement the Debtor warranted its own continued solvency.

After payment of the $20,000 debt and the assignment of the Schedule A. insurance policies referred to in Paragraph 7(d), the Debtor's substantial duties were limited to payment of the notes, and the maintenance of certain insurance on Daniels' life, and Daniels' substantial obligations were limited to performing his undertaking not to compete. The parties have ignored the insurance provision and it is inferred that, for some reason, it is unimportant. The additional undertakings are substantively different. There are supportive undertakings by the Debtor: to keep its president's salary to a certain level; to see that all officer contracts are automatically terminable upon Daniels' cancellation of the agreement; and to furnish Daniels periodically with financial data. Effective at and after default are remedial provisions that empower Daniels to audit the Debtor's books, inspect its stock and properties and then, within 100 days after default, either (a) cancel the agreement by notice, repay half the purchase money received, reclaim the stock, return along with one nominee, to the directorate, and again become an officer, or (b) send no notice but surrender the unpaid notes, treat the money already paid as full payment for the stock and release the stock to the Debtor. (In the event of Daniels' election to cancel, repay half the money and repossess the stock, the non-negotiable notes are not expressly required to be surrendered: they would be unenforceable by reason of the cancellation.)

The substratum of Daniels' argument is that the first alternative implied that the Debtor would not by any act amounting to breach of contract disable itself from making reinvestment of stock ownership and management in Daniels worthwhile. Perhaps that approach assumes the point in issue, for the question is whether the alternatives are both remedies for breach or are (one or both of them) substantive promises of contractual performance: Paragraph 5 characterizes either the pair of alternatives or the first alternative alone as a "sole remedy." But apart from that, and treating the matter as one of interpretation in terms of the real, the substantive exchanges involved (with the strikingly

careful language of the agreement playing a subordinate role in interpretation), it appears plain that the genius of the agreement was that Daniels should very quickly get $100,000 and as much more as the Debtor could pay up to $250,000, and, in the event of a default, have the power then to make an informed judgment whether to keep what he had received and cry quits, or to get back into the business and effect a rescue, keeping half of what he had received as his "liquidated damages" and putting the rest back into the business as—obviously—much needed working capital. The latter alternative may be thought a species of rescission plus damages for breach. Cf. New York Personal Property Law, McKinney's Consol.Laws, c. 41, § 150(d). The first alternative supposes that the full price was safely high and that in some circumstances Daniels would be well advised to be content with what he had received. The agreement was, intrinsically, calculated to provide Daniels with a complete substitute for such a promise or condition as he would now have implied. The choice between the contractual alternatives expresses, and provides against the existence of, the flagrant possibility that the Debtor's future—if it defaulted—could vary between the disastrous and such a degree of misfortune as would produce a default without hopelessness. Both alternatives of remedy are, then, addressed to degrees of business failure and not to the eventuality of business success.

So viewed the agreement precludes implication of a promise (or condition) not to embrace the benefits of the Bankruptcy Act the very implication of which would operate to nullify the scheme of required alternative choices in the event of default. The language and form of the agreement, as the learned Referee has pointed out, powerfully reinforce the view that the agreement must be read as putting Daniels to his choice notwithstanding the filing of the Chapter XI proceeding.

It is not necessary to consider what result would have followed if the Debtor had deliberately defaulted, while solvent, in order to force upon Daniels a choice between the remedial alternatives; it is the easier to forego that since the circumstances in which that course could have been attractive to the debtor are narrow. But adversion to that remoter possibility throws some light on the weakness of Daniels' basic position, here, in treating default and its consequences as partaking of the quality of an act of contractual volition.

The expressions that treat the supervention of bankruptcy as a breach of contract appear to relate to the problem of provability in face of an objection of immaturity or contingency or both (Cf. Maynard v. Elliott, 1931, 283 U.S. 273, 51 S.Ct. 390, 75 L.Ed. 1028; 4 Corbin, Contracts (1951) 818, 952, §§ 949, 950, 985; 7 id. 38, 361, §§ 1261, 1332) and, plainly, can operate only where 11 U.S.C. § 110, sub. b, requiring the trustee to assume or reject executory contracts within 60 days of adjudication, permits the operation of the "breach" analysis. In the present case, at least until the April 2, 1963, default, the future monthly instalments were immature debts and "executory" only in the very limited sense that an immature obligation can be so regarded. When the default occurred and was not cured, the immature debts simply dissolved, under the agreement, for then, on the eleventh day after default, no matter which alternative Daniels chose, the monthly instalments ceased. On the day the petition was filed nothing remained except for Daniels to elect and that he could do, in the light of the pendency of the proceeding, unembarrassed by anything in the Bankruptcy Act. There was then, however, no extant executory promise that the filing of the petition could break. Unless, therefore, there genuinely were an implied promise to forego the Bankruptcy Act, there could be no breach of any contractual promise or condition in filing under Chapter XI. But no case suggests, and in reason there could not be, a meaningful implied prom-

ise-in-gross, as it were, not to seek the benefits of the Bankruptcy Act and cases suggesting that filing a voluntary petition under the Act is or can be a breach of a promise to render a continuing contractual performance are beside the point.

Even, then, were the effect of the Chapter XI proceeding such as to make the alternative of the right to be reinstated in ownership and management valueless, there would be no breach on the Debtor's part in filing the petition. The particular circumstances of its filing would indicate only that the one alternative was so valueless as to dictate choice of the other. The agreement contemplated that and that has been Daniels' choice. But the filing of the Chapter XI proceeding does not legally worsen matters as against what they would have been had no petition been filed. It neither extinguishes corporate existence, ends the role of management, nor portends necessary elimination of the equity. Indeed, the voluntary filing of a Chapter XI petition can only be viewed as intending and calculated to attain an improvement in the Debtor's lot by presenting a plan of arrangement to the affected creditors.

Accordingly, on the Petition of Alan Daniels to review the order of November 26, 1963, it is

Ordered that the order of the Referee made on November 26, 1963, be and it is in all respects confirmed.